UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

TASHA ALLEN,
formerly known as Tasha Hewitt,

      Plaintiff,

v.                          Civil Action No. 2:22-cv-00388

STEVE STEPHENS,
ROB SIMS, and
THE WOOD COUNTY COMMISSION,

      Defendants.

MEMORANDUM OPINION AND ORDER

      Pending are defendants Sims and Wood County Commission's ("the Commission") Motion for Summary Judgment (ECF No. 82) and defendant Stephens' Motion for Summary Judgment (ECF No. 84), both filed December 7, 2023.

I. BACKGROUND

A.   Facts

      This action concerns events that occurred while plaintiff Tasha Allen[1] was a deputy sheriff at the Wood County Office of the Sheriff ("Sheriff's Office"), where she was

---

[1] Plaintiff commenced this action under the surname Tasha. The court has since granted her motion to amend the pleadings to identify plaintiff by her married name. See Order, July 25, 2023, ECF No. 61.

employed from 2018 until July 15, 2023.  See Pl. Dep. at 14:24–
15:9, 19:4–17.  Defendant Steve Stephens was the Wood County
Sheriff from January 2017, until his retirement on December 1,
2021.  Stephens Dep. 8:12–14; Stephens Mem. Supp. 2.  Plaintiff
alleges that she endured sexual harassment in the form of a
hostile work environment, and retaliation while at the Sheriff's
Office, behavior which she primarily attributes to Stephens,
either as instigator or because of the precedent he set in the
office.

Plaintiff began her career in law enforcement in 2017,
as a police officer with the Elkins Police Department.  Pl. Dep.
at 13:24–14:5.  Six months later, in 2018, plaintiff went to the
West Virginia State Police Academy.  Pl. Dep. at 14:16–15:1.
Around the time she applied to the Elkins Police Department,
plaintiff had also applied to work with the Wood County Office
of the Sheriff, and while she was at the Academy, she was
contacted by Stephens about working as a Wood County Deputy
Sheriff.  Pl. Dep. at 15:4–17:7.  Plaintiff pursued the Wood
County opportunity.  Pl. Dep. at 15:4–17:7.  She had already
undergone the physical fitness, agility, and written testing for
the position, but she had to complete final hiring steps, such
as passing a polygraph examination and completing a
psychological evaluation, before she could be hired.  Pl. Dep.
15:21–18:2; Stephens Dep. at 26:13–29:23.

As part of the background check, plaintiff submitted written responses to a set of questions and underwent a polygraph examination.  See Stephens Dep. at 26:13–29:23. According to plaintiff, she wrote in her application that she may have failed to disclose pertinent information to a family court judge, which she made known in her application "in a spirit of full and honest disclosure."  Pl.'s Resp. to Stephens 7.  The incident about which she wrote occurred in 2012, while she was in family court finalizing her divorce from her first husband.  Plaintiff was pregnant, but did not disclose this to the family court judge; she was nineteen years old at the time. Pl. Dep. 124–29.  Plaintiff testified that she was not asked whether she was pregnant and was never intentionally untruthful, but was later told by family or friends that failing to disclose a pregnancy in family court was tantamount to lying, regardless of whether she was asked.  Pl. Dep. 127.

Sergeant Derek Cross and Detective Matt Hupp assembled plaintiff's hiring packet – performing the initial review of plaintiff's application, polygraph results, and background investigation – and Cross informed Stephens of plaintiff's disclosure of the family court incident.  Cross Dep. at 8:12–15. It appears that plaintiff's disclosure came to read in her hiring packet: "Lied during Family Court hearing about being pregnant."  See Cross Dep. at 10:14–11:3.  Cross said he

3

discussed the issue with Stephens because Cross "felt this would be something that would prevent her from working" at the Sheriff's Office, but that Stephens "said that it wouldn't." Cross Dep. at 10:14–11:3.

Stephens and Sims were not concerned about the disclosure at the time plaintiff was hired; they both considered the circumstances of the incident, including the timing, to make the disclosure a non-issue.  See Sims Dep. at 21:4–18; Stephens Dep. at 47:11–48:4.  Stephens testified that to his knowledge no one attempted to obtain the family court records or consulted with Lefebure.  Stephens Dep. at 54:12–22.[2]  Stephens and Cross

---

[2] When asked about the impact of this on plaintiff's hiring, Stephens said the following:

> Sergeant Cross brought up to me the fact about she admitted that she had lied in family court — Wood County Family Court.  And I asked him, I said well, okay.  I mean there's a lie, but there's a lie to me.  If somebody is lying, what did she lie about?  He said there was a question asked something about if she was pregnant or something to that matter and apparently she told them she wasn't when she was. . . . To me, that didn't — that wasn't troublesome to me.

Stephens Dep. at 47:11–48:4.  Sims testified that at the time he didn't know what the "lying under oath" on plaintiff's background investigation pertained to, but said that "given the circumstances, we — that was not so much of a concern."  Sims Dep. at 21:4–8.  When asked if he had any concerns at the time about whether to report that to the prosecutor, Sims responded in the negative: "I felt that it could be something as simple as putting the wrong information down on a petition. . . . And without trying to delve deeper into what is essentially sealed

testified that they were not very familiar with <u>Giglio</u> issues at the time.  Stephens Dep. at 48:14–49:9; Cross Dep. 10–17.  Sims testified that he was familiar with <u>Giglio</u> at the time, but because of the context of the family court incident, and in particular that it occurred before plaintiff was in law enforcement, he did not think it was necessary.  Sims Dep. at 22:1–10.

While the ultimate hiring decision fell to Stephens, he testified that he likely discussed hiring plaintiff with Sims, and with Dave Bussey and Matt Hupp from the detective bureau, who together comprised his "go to group of guys that we discussed applicants and candidates with" – as well as with Cross, who had performed the background investigation.  Stephens Dep. at 52:11–53:14.  Stephens testified Cross did not convey any significant concerns about hiring plaintiff at the time and that he did not recall anyone voicing concerns about hiring plaintiff, and plaintiff was ultimately hired.  Stephens Dep. at 51:10–52:10, 53:9–11.

Plaintiff had many different supervisors during her time at the Sheriff's Office.  Pl. Dep. at 21:6–26:15.  At

---

files with the family court, I did not feel that it would impact her being hired or her being in the department."  Sims Dep. at 21:12–18.

various times, plaintiff reported directly to Andrew Shiver, Jason Allen, Derek Cross, Ryan Windland, and others.  Pl. Dep. at 23:8–15.  Plaintiff testified that her supervisor could change daily based on which sergeant was scheduled for what shift.[3]  Pl. Dep. at 23:16–24:1.  Plaintiff testified that normally, as a deputy, she would report directly to a sergeant and that as a deputy, it was rare to engage with a lieutenant.[4]  Pl. Dep 25:13–26:15.  A deputy's supervisor would be whichever sergeant was on that shift, or the senior sergeant, if more than one was on the shift.  Stephens Dep. at 98:7–13.

Plaintiff filed a written harassment complaint against Stephens in February 2020.  Stephens Mot. Summ. J. ¶ 2.  Two of the primary allegations against Stephens were that he called plaintiff a "whore" and he tried to put a wedge in plaintiff's relationship with Tim Allen.  When asked in her deposition about the events leading to the June 2020 Settlement, plaintiff responded thusly:

> It was him [Stephens] calling me a whore to approximately everyone on the department.  It was the fact that he said to other officers

[3] Stephens explained that on any given shift there were hopefully six or seven deputies on duty and usually one, and sometimes two, sergeants.  Stephens Dep. at 98:2–6.

[4] Plaintiff explained: "We usually didn't engage with the lieutenants unless, you know, we needed to and the sergeants [–] it was like a chain of command thing, sergeants would speak to lieutenants."  Pl. Dep. 26:6–15.

6

> that he only sent Tim [Allen] to the Academy
> to ruin our happy little family.  It was the
> fact that he said he wish he'd sent me instead
> because I'd have f***ed all the troopers. . .
> . [I]t was also the fact that he tried to
> interfere with my divorce proceedings with my
> ex husband Shane Hewitt.  Shane even said that
> he [Stephens] called him trying to get him to
> pursue criminal charges against me.

Pl. Dep. at 47:10-23.  Stephens admitted in his deposition to
calling plaintiff a whore prior to the settlement. Stephens Dep.
at 116:2-15.

Her complaint prompted the Commission to hire the law
firm Bailey & Wyant to investigate the claims, which resulted in
a confidential settlement agreement on or about June 4, 2020
("the 2020 Settlement"), related to allegations of harassment,
discrimination, and hostile work environment, and released
Stephens, the Commission, and the Sheriff's Office.[5]  Stephens
Mot. Summ. J. ¶¶ 2-3; Sims & WCC Mem. Supp. 2; Pl. Dep. at 46.
In particular, the claims were settled by the liability/risk
management company engaged by the Commission.  See Couch Dep. at
41:19-42:1; 76:9-16.  The settlement was arranged by the
Commission, although Blair Couch, one of three Wood County
Commissioners, testified that the county did not have any role

---

[5] Part of this investigation involved determining whether there
were grounds for removal of Stephens.  Couch Dep. at 19:21-20:2.
Couch testified that he did not believe the transgressions rose
to the level of removal.  Couch Dep. at 21:11-23.

in drafting the settlement agreement itself. <u>See</u> Couch Dep. at 44:7-10.

Stephens testified that he did not know anything about the settlement until after it was signed. He "had no input, no retribution . . . [and was not able] to discuss [his] side of the story with the county," nor has he ever seen the settlement agreement. Stephens Dep. at 71:20-72:18. Although the complaints were against Stephens, the settlement agreement specifically releases the county commission. Stephens Dep. at 13:11-14:1.

Stephens was told after the settlement that plaintiff was not to be retaliated against. Stephens Dep. at 66:3-69:14. Stephens says he reached out to the supervisors (including Cross) to notify them of the same. Stephens Dep. at 66:3-69:14. Sims testified that although he couldn't remember specifically being told this after the settlement, not retaliating against a person for filing a harassment complaint is "pretty much common sense for any type of administrator." Sims Dep. at 30:21-31:8. Stephens said once he was warned about that, "I had very little contact verbally, email or anything with Tasha." Stephens Dep. at 66:18-19.

According to plaintiff, she continued to experience harassment, discrimination, and retaliation subsequent to the 2020 Settlement, for which she brings the current action.

A long-running issue, at least as far as Stephens was concerned, appears to have been plaintiff's relationship with Tim Allen.  The two became romantically involved in the year after plaintiff began working at the Sheriff's Office, and eventually married in December 2022.  Pl. Dep. at 37:9-15. Stephens considered the relationship between Tim Allen and plaintiff to verge on conduct unbecoming an officer, not because of their difference in rank (Tim Allen was a sergeant and plaintiff was a deputy), but because they were both still married, albeit separated, to other people at the time. Stephens Dep. at 101:8-19.  Stephens admitted that he considered the situation immoral and questioned whether it was even legal, saying he's "an old guy" and "I thought there was a state code about that."  Stephens Dep. at 100:7-20.[6]  Stephens objected

---

[6] Stephens explained further:

> A. It became a very hot topic at the sheriff's department with Tasha and Tim's cohabitation and they were both still married at the time. And there were deputies that didn't have a problem with that.  There were deputies that thought that, you know, we ought to take their heads and cut them off, you know.  Those type things.

morally and voiced those objections to the couple, prior to the June 2020 Settlement.  Stephens Dep. at 101:14−104:19.

The first post-settlement incident is alleged to have occurred sometime in September 2020, three months after the settlement, referred to in the court's earlier order as the "pregnant clothing incident."  At that time, plaintiff was in her second trimester of pregnancy and there were two concurrent discussions, one in which plaintiff perceived Sims was insinuating that she was fat, the other concerning the appropriateness of plaintiff's maternity clothing for the office.  Pl. Dep. at 54:14−59:13.  Plaintiff was working "light duty" at the time, meaning she worked in the office responding to public complaints and phone calls.  Pl. Dep. at 55:19−56:4.

Plaintiff contends that the first encounter occurred in Stephens' office and that both Stephens and Sims were

---

Q. Sure.

A. I mean from one extreme to the next.  I even had retired deputies sending me information that I wasn't doing my job because I was allowing that to happen.  So I will tell you what I did do. . . . I reached out to Pat Lefebure, my legal counsel. . . . And I said Pat, here's the situation.  What do you think?  He says, Steve, I wouldn't touch it.  I said okay. . . .

Stephens Dep. at 101:14−103:5.

10

present.  She testified that "Sims talked about how his father
was an OBGYN and he'd seen many pregnant women and none of them
were as big as I was and Steve Stephens concurred with that . .
. ."  Pl. Dep. at 54:17–21.  Plaintiff says Sims never
explicitly called her fat, but that

> he [Sims] essentially said that I was fat.  I
> was big.  I was really big for how far along
> I was. . . . He talked about, like fat women
> and then it was like you're really big
> compared to, like, other pregnant women.  He
> used the word fat in there, but I don't know
> that it – it wasn't directed at me like you're
> fat.[7]

Pl. Dep. at 57:6–19.  When asked what she found offensive about
the conversation, plaintiff testified: "I think any woman who's
pregnant is really kind of self conscious when it comes to those
things and he passively aggressively indicated that I was fat."
Pl. Dep. at 58:12–18.

    Sims testified that plaintiff was never called into
the Sheriff's Office; he said that plaintiff passed him in the
hall and, in what he thought was a "companionable tone," he
said, "Looks like you're showing."  Sims Dep. at 40:7–11.  "She
was never called into an office and dressed down about being fat

---

[7] When asked whether she believed the conversation was about
pregnant women generally, plaintiff responded: "It could have
been, but it could have also been he was just trying to be an
asshole and call me fat."  Pl. Dep. at 59:8–13.

or . . . about not being able to fit into her uniform." Sims
Dep. at 40:12–15.

As to the issue of office-appropriate clothing for
light duty, Stephens says plaintiff was told she had to wear
business casual attire and no shorts. Stephens Dep. at 148:13–
14. Plaintiff says the dress code for light duty was explained
to her as "whatever [she] wanted other than shorts," and that
there was never any email or official policy circulated on the
matter. Pl. Dep at 61:24–62:5. On the same day or the day
after Sims allegedly implied plaintiff was fat, Stephens
recounted that plaintiff was wearing "jeans with big old rips
down the kneecaps and like three or four [inch] wide open
[holes]," commenting, "if that's her taste, that's fine, but
unfortunately, that wasn't business casual." Stephens Dep. at
149:2–7. Plaintiff testified that at the time she was wearing
somewhat baggy maternity jeans that "had a couple holes in
them," and a tee shirt. Pl. Dep. at 61:17–23. Sims also
recalls that plaintiff had come into the office "wearing torn or
ragged jeans," which was "not appropriate dress for the
position." Sims Dep. at 41:19–42:1.

Sims spoke to plaintiff about the inappropriate
clothing. Sims couldn't remember the exact words he said to
plaintiff, but that the gist was that her clothing wasn't

appropriate and "You need to dress correctly."  Sims Dep. at
42:3–7.  Plaintiff testified: "[Sims] told me that I needed to
get clothes that fit me and then directly after that he walked
around to the other side where, like, the deputies' cubicles are
and Tim [Allen] was sitting over there and he told Tim that he
needed to buy more clothes for me."  Pl. Dep. at 55:2–7.

Plaintiff acknowledged that she was subject to the
same rules and regulations at the office regardless of whether
she had previously made complaints, but said she was "put under
a microscope and nitpicked because [Sims] didn't want me there,
nor did Steve Stephens."  Pl. Dep. at 266:13–16.  She
communicated with Lefebure and Marty Seufer, the County
Administrator, about the incident by text message.  Pl. Dep. at
59:21–60:2; see Text Messages between T. Hewitt to P. Lefebure,
Sept. 18, 2020, ECF No. 82-5 at 35–37.  She says that, although
she did not ask either of them to perform an investigation, she
"wanted to make them aware of what was still occurring assuming
they would look into it at least," but that she never received
any follow-up on the matter and no investigation was made.  Pl.
Dep. at 68:7–68:16.  Plaintiff's assertion that this incident is
indicative of a hostile work environment is baseless.

A year after the settlement, in or around July 2021,
two related incidents occurred: the "Cross GPS incident" and

"disparaging comments incident."[8]  In the "Cross GPS incident,"
Stephens, Sims, and Cross were in Stephens' office when Stephens
asked Cross whether Cross and plaintiff were having an affair.
Stephens Dep. at 156:19–157:2.[9]  The deputy cruisers assigned to
plaintiff and Cross were each equipped with GPS devices that
allowed Stephens to see where they were located.  Cross and
plaintiff's houses were within eyesight of one another, and so
the map plotting the GPS locations, when not fully zoomed-in,
showed Cross and plaintiff's vehicles at the same location.
Cross was "pretty angry" about the perceived slight and said to
Stephens, "I wouldn't touch her with your dick."  Cross Dep. at
21:11–13.  Cross says he then showed Stephens that the map, when
zoomed in, showed that the vehicles were a block away at their
respective houses.  Cross Dep. 27:16–28:8.  Cross testified that
his comment wasn't meant to be derogatory towards plaintiff, but
that it was said in the heat of the moment in response to the

_____

[8] Also in July 2021 was the "shift exchange incident."  The court
granted judgment on the pleadings to defendants on plaintiff's
West Virginia Human Rights Act sex discrimination claim as to
this incident and held it was precluded by plaintiff's EEOC
complaint from being used on the Title VII claim.  Suffice it to
say that plaintiff requested a schedule change which was
initially denied but, once she stated it was for childcare
purposes, was approved.  The entire matter was resolved in a
matter of hours.  This minor incident is disregarded.

[9] "Q. Did you accuse Cross of having an affair with Tasha Hewitt
during this meeting?  A. Not in so many words.  I asked him what
he was doing at her house."  Stephens Dep. at 156:19–22.

insinuation that he would cheat on his wife.  Cross Dep. at
21:11–22:9.

        Sims testified that he thought Stephens was making a
joke.  Sims Dep. at 47:8–14 ("Sheriff Steve Stephens made a joke
with Derek Cross about his car being parked close to Tasha
Hewitt's car at their residences . . . .").  According to Sims,
Stephens said something "along the lines of[,] we noticed you
and Tasha's cars are parked close together . . . [i]s there
something we should know?"[10]  Sims Dep. at 47:23–48:3.  Sims
remembers Cross responding "in the negative fashion."  Sims Dep.
at 48:6.

        Stephens said the Cross GPS incidents was "a big blown
up deal," and that he had a legitimate reason, as Sheriff, for
knowing whether different deputies were involved with one
another.  Stephens Dep. at 114:19.  Stephens testified that he
did not use the word "whore" in the meeting with Cross and Sims.
Stephens Dep. at 156:15–18.

---

[10]
            Q. Was it appropriate for Sheriff Stephens to
            be making such a joke in the workplace?

            A. And that is the touchy spot.  It depends on
            how the joke is received.

Sims Dep. at 48:7–10.

The GPS questioning incident allegedly led to an onslaught of derogatory comments soon thereafter about plaintiff at the office, referred to as the "disparaging comments incident," when the conversation in Stephens' office became known around the office.   According to plaintiff:

> I was made aware by Della Matheny and a few
> other deputies stating that Derek Cross was
> pulled into Steve Stephens's office by Steve
> Stephens and he questioned him in regards to
> why he was at my house in his cruiser. . . .
> And he accused him of F'ing me and Derek Cross
> said I wouldn't touch her with a ten foot pole
> and immediately after that conversation Derek
> Cross went out amongst the other deputies that
> we work with and told them about that
> discussion and continuing to indicate that I
> was a whore.

Pl. Dep. at 96:5-23.   Plaintiff says she never spoke to Cross about the incident.   Pl. Dep. at 97:5-19.   She testified that Cross' comments had a wide reach:

> They would all hear it.   There was Ryan
> Windland, lieutenant at the time, he called me
> that constantly.   Called me a whore constantly
> and other deputies heard it.   Cross had called
> me a whore.   Other deputies heard it.   Della
> [Matheny] and Swiger are the ones that came to
> me about Cross saying it.
>
> Deputy Kidder and Marlow, we had a discussion
> about Ryan Windland calling me a whore.
> There's another deputy there, McLaughlin, he
> overheard that and came to me many times
> saying that those individuals were calling me
> a whore.

Pl. Dep. at 104:8-20.   Sims testified that Matheny said three people had called plaintiff a "whore" – Windland, Cross, and

John Wetzel — but that "they [Tim Allen, Matheny, and possibly plaintiff] weren't concerned about John Wetzel because they had talked to him on the side, and he was fine." Sims Dep. at 50:9–16.

Plaintiff says she never directly heard the derogatory language, but was informed by others about it. Pl. Dep. 105:19–106:4. Stephens also testified that he had people notify him that Cross allegedly called plaintiff a "whore." Stephens Dep. at 159:14–19. Cross denied that he ever heard anyone in the office call plaintiff a whore. Cross Dep. at 20:18.

Plaintiff says she did not communicate with Stephens or Sims about the Cross GPS incident or the ensuing disparaging comments, but that Matheny and Tim Allen spoke to Stephens and Sims on her behalf, demanding that the hostility cease. Pl. Dep. at 109:13–110:4.[11] Sims provided that he was meeting with Tim Allen, Matheny, and Lieutenant Murphy for a different reason when Matheny said there were ongoing issues; "she [Matheny] was pointing at the wall, towards his [Stephens'] office, 'And it all stems from him,' that he allows it." Sims Dep. at 49:18–21. "I believe that's when Tim [Allen] chimed in that his

_____

[11] In fact, plaintiff said she did not think she ever spoke to Sims or Stephens again from the time of the July 2021 incidents on, saying they usually communicated with her through Tim Allen. Pl. Dep. at 110:15–20.

17

girlfriend, Tasha, was being or had been called a whore. . . .
It was essentially that Della was saying Steve Stephens had set
the precedent, and others were following it."  Sims Dep. at
49:24–50:12.  Sims said the allegations caused him concern
"[b]ecause that makes it a hostile environment, and we do not
need that in the agency."  Sims Dep. at 51:2–7.  Sims said he
was the one who went to Stephens with those allegations, and
that Stephens subsequently sent out an email to the department;
he also thought Tim Allen may have spoken with Stephens directly
about an investigation.  Sims Dep. at 51:17–21, 65:2–10.

Stephens recounted these events slightly differently,
saying that Tim Allen came to his office "visibly upset" and
told Stephens, "Sheriff, I need to get this stopped.  My wife is
coming home, she's crying."  Stephens Dep. at 159:20–160:8.
Stephens said he wrote up the email while Tim Allen was in his
office and that Stephens read the email aloud to confirm it
would suffice; when Tim Allen confirmed that it would, Stephens
sent it to the department.  Stephens Dep. at 160:10–16.

Regardless of whether it was Sims or Tim Allen or both
who went to Stephens' office and prompted Stephens to write the
email, the email stated that officers would be disciplined or
reprimanded for making disparaging comments about their

colleagues.[12]  Pl. Dep. at 111:12–23.  Plaintiff acknowledged

that the email was effective in stopping the disparaging

comments.  Pl. Dep. at 111:18–23.  However, she felt that

Stephens sent the email "essentially to protect himself," as she

considered the behavior "ultimately came from him" in the first

place.  Pl. Dep. at 112:1–18.  Plaintiff had the following

exchange during her deposition to that effect:

> Q.  [D]o you think it [the email] was an
> appropriate response by Stephens given Tim
> Allen's discussion he had with Chief Deputy
> Sims on this subject?
>
> A. Not really.

_____

[12] The email from Stephens was sent on July 22, 2021, and reads
as follows:

> Today, it was brought to my attention that
> there are deputies that are alleged to be
> violating this policy [set forth below] when
> it concerns speaking about other members of
> the department in a disrespectful manner.
> This activity will not be tolerated by this
> office and anyone violating this policy will
> be subject to an internal investigation and
> the appropriate discipline.  Please take heed
> to this email and cease and desist if you are
> involved in saying anything in this
> unacceptable manner or spreading these
> comments through the department.  If you hear
> of any such behavior, the proper channel is to
> make your supervisor aware and if not
> comfortable in doing so with them, make the
> Chief and/or I aware so it can be dealt with
> immediately.

Stephens Email July 22, 2021, ECF No. 82–9 at 3.  Following the
quoted text was office policy 1-2-7, entitled "Relationships
Among Deputy Sheriffs."

Q. Why not?

A. Because it says make the chief and/or I aware so it can be dealt with immediately when it all transpired from them.

. . .

Q. So are you testifying that you think it would be better if Sheriff Stephens had not sent this e-mail out?

A. It was appropriate for him to send it out to hopefully stop that, but I feel like he was the main reason as to why this even started, so.

Q. Sort of seemed, I don't know if it's the right word, seemed ironic or strange to you that he would send something like this out since you believe he was somehow responsible for this happening?

A. Yes.

Q. You don't have any information or knowledge, do you, that Sheriff Stephens encouraged any other officers or deputies within the sheriff's office to make derogatory comments about you?

A. I don't have any evidence of that, but I think it continued because he supported it.

Q. You don't have any evidence to show that he did, in fact, support it either though, do you?

A. I'm sure other deputies have testified that he supports it.[13]

---

[13] Plaintiff does not provide any deputies' testimony to this effect, although her deposition suggests that Della Matheny, at least, would likely testify as such. However, Stephens attached to a motion in limine (ECF No. 108) the complaint Matheny filed in her case in state court against Stephens. See Stephens Mot. in Limine to Exclude News Articles & Other Inadmissible Docs., ECF No. 108. The allegations in the Matheny Complaint support

Pl. Dep. at 231:4–232:15.

Plaintiff testified that after receiving Stephens'
email, Cross attempted to intimidate officers who had heard his
derogatory comments into not reporting what they had heard (the
"three deputies" incident).  Pl. Dep. at 120:4–121:3.  Plaintiff
said she was told by Swiger, Kidder, and Marlow that, after the
Stephens email, "Cross went up to those individuals basically
trying to retract what he had originally said to them . . .
Cross came up to them and said I didn't say that, you know, you
guys need to not say that's what I said."  Pl. Dep. at 120:14–
21.  Plaintiff says the intimidation came in the form of Cross'
rank: "He was a supervisor above all of them, so I think just a
supervisor coming up to you and saying I didn't say that, you
need to take that back is intimidating."  Pl. Dep. at 120:24–
121:3.

In addition to the email, Stephens and Sims instigated
an internal investigation regarding the allegations that Cross
and Windland were calling plaintiff a whore.  Stephens Mot.
Summ. J. ¶ 14; Sims & WCC Mem. Supp. 7.  The investigation was
conducted by Lieutenant Bussey, who was considered sufficiently
independent from the allegations.  Stephens Dep. at 161:5–24.

---

plaintiff's claim.  See Matheny Complaint, Stephens Mot. in
Limine Ex. 5, ECF No. 108-5.

Both Cross and Windland were determined to have made disparaging comments about plaintiff and were verbally reprimanded; Cross said that he "basically got a piece of paper that said I was given a verbal reprimand, with no explanation." Cross Dep. at 23:9-11.

At the time of the Cross GPS and disparaging comments incidents, plaintiff's counsel notified Bailey & Wyant of the behavior, as they had performed the first investigation of plaintiff's sexual harassment allegations. Pl. Dep. 106:9-107:7. Plaintiff testified that she did not attempt to reach out to Lefebure because she perceived he had not done anything in response to the pregnant clothing incident she had previously told him about. Pl. Dep. at 107:14-20. She says County Administrator Seufer was sick at the time, so she tried to reach out to Blair Couch, one of the three commissioners on the Wood County Commission; however, despite sending text messages, making phone calls, and leaving messages at his office, she says she never received a response. Pl. Dep. at 107:14-24. Plaintiff explained that she reached out to Couch "[t]o let him know that this was continuing and something needed to be done." Pl. Dep. at 108:9-10. She says her messages did not detail the issue, but broadly stated that she had information to convey and asked that her call be returned. Pl. Dep. at 108:23-109:3.

Couch testified that he received a phone call from someone at the sheriff's department giving him a heads up that plaintiff was trying to get in touch with him and that she was upset, but the caller didn't specify about what.[14]  Couch Dep. at 58:19–59:24.  Couch soon thereafter received a text message from plaintiff in March 2021, which was submitted as evidence at his deposition.  Couch Dep. at 58:6–17.  He did not respond to plaintiff's message, but instead called Lefebure.  Couch Dep. at 60:3–8.  Couch said he had never communicated with plaintiff and his reaction to the message when speaking with Lefebure was, "what the hell . . . [h]ow did she get my number;" and he also asked whether plaintiff was a danger to herself or others. Couch Dep. at 60:10–12, 61:21–22.  One reason given by Couch as to why he didn't respond to plaintiff was that "talking to someone that sued us would require me to ask for an attorney." Couch Dep. at 62:5–7 (noting that there was the potential lawsuit at the time).  Couch didn't direct Lefebure to do anything in response to the message and didn't think anyone had done anything in response.  Couch Dep. at 62:22–63:8.

Plaintiff testified that Stephens' email put a stop to the derogatory language "for a few months," but that retaliatory

---

[14] Couch could not recall who at the Sheriff's Office called him. Couch Dep. at 58:19–59:24.

conduct eventually resumed, recounting the following incidents.
Pl. Dep. 112:15–113:9.  The Cross GPS and disparaging comments
incidents lasted a few weeks to a month, with the Cross GPS
conversation occurring sometime in late June or early July, and
the Stephens email being sent July 22, 2021.

In the "childcare comments incident," which occurred
after the Cross GPS and disparaging comments incidents and
around the same time as the three deputies incident, plaintiff
says Deputy Burns was upset that his schedule had been changed
with plaintiff's, despite his seniority, prompting Sergeant
Shriver to comment that he had never known childcare to be a
good reason for a schedule change.  Sims & WCC Mem. Supp. 7–8;
Stephens Mot. Summ. J. ¶ 16; Pl. Dep. 236.  Plaintiff reported
this comment to Lieutenant Allen (Tim Allen's cousin).  Notable
in this incident is that, during the follow-up discussion with
Lieutenant Allen, Shriver purportedly said, "I'm never helping
her out again because [she] made a complaint."  Pl. Dep. at
122:24–123:1.  This incident (although not the comment about
never again helping plaintiff) is documented in an email
exchange between Lieutenant Allen and Stephens.  See Email
Exchange between Sims & Lieutenant Allen, July 29, 2021, Sims &
WCC Mot. Summ. J. Ex. 11, ECF No. 82-11.  This minor abrasion
need not be further considered.

In August 2021, plaintiff was placed on the <u>Giglio</u> list.[15]  Cross testified that sometime in 2021, while working with the Wood County Prosecutor's Office, he became more educated on <u>Giglio</u> issues and was concerned that he could be implicated for not turning over the alleged false testimony issue, wherein plaintiff seemed to admit during the hiring process that she had lied in family court, to Lefebure.  Cross Dep. 10–17; Sims & WCC Mem. Supp. 3.  When asked why he told Lefebure about plaintiff allegedly lying in family court, Cross explained:

> Probably 10 days to two weeks prior, I was speaking with Pat Lefebure.  We were doing trial prep for a murder case that I was the first on the scene of. . . .
>
> He kind of explained to me – which I had kind of briefly knew about from the academy, but I hadn't detailed looked at – <u>Brady v. Maryland</u> and <u>Giglio v[.] U.S</u>.  He kind of discussed those cases with me, and to kind of review the importance of that so that our officers didn't get in trouble.
>
> Over the next few weeks, I did, you know, in my free time kind of look at different cases where officers had been placed on a Brady or a Giglio list, and several of those that I had Googled involved officers lying under oath before becoming a police officer.

---

[15] A "<u>Giglio</u> list" is a term commonly used by prosecutors to indicate a list of law enforcement officers with credibility issues; the prosecutor must disclose to a defendant in a criminal trial if any officers involved in the case are on the list, under <u>Giglio v. United States</u>, 405 U.S. 150, 151–55 (1972).

> Remembering this, I felt that I should discuss
> it with him to make sure this wasn't going to
> be an issue, because I didn't want to get
> myself in trouble for not disclosing something
> that I should be disclosing to our prosecutor.

Cross Dep. at 12:20–13:23.  Cross testified as to the reason he waited three years to bring the information to Lefebure.  Cross says that because at the time of plaintiff's hiring he wasn't well-informed of Giglio issues and he was told by Stephens it was not a problem, he did not then believe it was an issue. Cross Dep. at 14:8–15.  However, upon learning that it could be an issue and that he himself could be implicated for failing to disclose what he knew, he brought the information to Lefebure.[16] Cross Dep. at 14:16–15:2.

Cross then provided Lefebure with a copy of plaintiff's background investigation.  Cross Dep. at 15:4–5, 16:1–2.  Cross testified that he bypassed Stephens and went

---

[16]

> It wasn't until I did my own research that I
> thought it might be an issue.  I had discussed
> it with Russ Skogstad, who is kind of second-
> in-charge of the prosecutor's office.
> Actually I tried to call Pat [Lefebure] first,
> and he didn't answer his phone.  So I discussed
> it with Russ, and he said that I absolutely
> need to talk to Pat about it, that I could
> actually be put on the list myself if I didn't
> disclose that.

Cross Dep. at 14:16–15:2.

straight to Lefebure because he did not think Stephens would

take any action:

> After Tasha received a payout, I guess from
> the county, for sexual harassment, Steve
> Stephens refused to hold her accountable for
> anything in my opinion. . . . .
>
> I felt that if I discussed this situation with
> him prior to going to Pat [Lefebure] that he
> would order me not to do it, and I was afraid
> for my own career for being placed on a Brady
> [Giglio] list myself.

Cross Dep. at 16:11–17:4.  Stephens testified that he wasn't

aware of Cross' concerns or actions until he was informed by

Lefebure that Cross had disclosed plaintiff's hiring packet.[17]

Stephens Dep. at 55:21–56:3, 57:8–59:10.

    The relevant excerpt from plaintiff's personnel file,

assumedly taken from the hiring packet, as read during

plaintiff's deposition, is as follows: "The applicant also added

two additional comments to the questionnaire that included

providing false information to a family court judge about being

pregnant during a court proceeding . . . ."  Pl. Dep. at 192:14–

17.

---

[17] Stephens took exception to the fact that Cross bypassed the
chain of command and went straight to Lefebure: "Sergeant Cross
is a subordinate.  He is — he was one of my trusted supervisors
that I had a lot of respect for and I felt that he kind of went
behind my back and did this without even coming and talking to
me, discussing it with me.  So that — I was a little bitter over
that."  Stephens Dep. at 57:8–59:10.

Lefebure, upon review of the information brought by Cross, determined to place plaintiff on the Giglio list. Lefebure Dep. 62-66.  His reason for doing so was developed in his deposition:

> Q. And so specifically, what was it about what you had learned from Sergeant Cross and Officer Wood that you felt met the standard of Giglio/Brady?
>
> A. Yeah.  So it was the fact that she was placed under oath in a family court proceeding and admitted to lying to the judge.
>
> Q. Okay.
>
> A. So I think that's – in my opinion, certainly would be Brady/Giglio issues for impeachment purposes because she's shown the propensity to lie under oath to judges.

Lefebure Dep. at 51:11-53:23.  Lefebure testified that he contacted the state prosecutor's institute to ask advice: "Hey, here's the scenario.  I mean, in my opinion, I feel this is Brady.  Do you agree?  Yes.  I think you absolutely have to do that."  Lefebure Dep. at 58:14-19.

Lefebure says he reviewed the information provided, then went directly to plaintiff; he says he also talked to the polygrapher, but wasn't sure whether he did so before or after speaking to plaintiff.  Lefebure Dep. at 51:11-53:23.  Lefebure said he never reviewed the family court record.  Lefebure Dep. at 51:11-53:23.  According to Cross, Lefebure had a private investigator, Doug Sturm, who works for the prosecutor's office,

complete an investigation on the issue of plaintiff lying under oath.  Cross Dep. at 15:13-18.

Lefebure contacted plaintiff and Stephens for individual meetings to inform them of his decision.  Pl. Dep. at 124:17-21; Stephens Dep. at 57:4-7.  Stephens met with Lefebure first; plaintiff arrived for her meeting with Lefebure as Stephens was leaving.  Pl. Dep. at 124:17-125:13.  Plaintiff said she did not try to convince Lefebure not to place her on the Giglio list because she was "in a rage," and that "[i]t was icing on the cake to everything that had already happened."  Pl. Dep. at 126:5-13, 133:4-21.  Plaintiff recounted the meeting thusly:

> Q. Did you have any conversations with anyone, Pat Lefebure, Steve Stephens, anyone at the Wood County Commission saying don't put me on this list because this is what really happened?
>
> A. No.  I didn't think I had that decision.  I wasn't advised whether I had a choice in the matter.  It was basically [']this is it['].
>
> Q. Okay, but you didn't rebuff that, didn't say Pat —
>
> A. Oh, I bottled it.  Whenever I was in rage after I was told I was getting placed on the list I said it was bullshit and I said that Steve Stephens was the reason for all of this and Pat Lefebure just shook his head like yeah and he's like I'm sorry and I walked out.
>
> Q. Did you tell Pat why it was bullshit?
>
> . . .

> A. I don't believe I went into detail in that
> room and regarding the totality of what
> happened to maybe change that. So there was
> no further discussion regarding it at that
> time.
>
> Q. Do you feel like if they had the full story
> they might have changed their viewpoint on
> placing you on that list?
>
> A. I feel like they should have got the full
> story before they put me on the Giglio list.
>
> Q. You had the opportunity to tell them the
> full story and you did not; correct?
>
> A. The impression I got was, like I said, this
> is what we're doing, it doesn't matter.
>
> . . .
>
> A. It was clearly indicated to me that this is
> [a] done deal, this is information provided to
> me, Tasha, I'm sorry, it is what it is.

Pl. Dep. at 133:4–134:16, 136:9–11. Plaintiff testified that she was not given the opportunity to inquire as to why she was being placed on the list or to explain or give context to the underlying incidents, and that she was not given any documentation as to why she was being placed on the list. Pl. Dep. at 267:23–268:10.

Lefebure said the following about the meeting with plaintiff:

> I mean, she was upset, you know. We kind of
> — I'm trying to figure out whether — one, you
> want to make sure that, Is this accurate?
> What's going on? And she acknowledged it was.
> And I said, Well, that, you know, implicat[es]
> — I don't think she understood the total
> implications of what, you know, lying under
> oath to a judge means as a law enforcement

> officer.  I don't – she had a lot of questions
> about that is my recollection.

Lefebure Dep. at 56:22–57:6.  He said when he presented her with

the evidence, plaintiff confirmed that she did it.[18]  Lefebure

Dep. at 59:21–24.  Lefebure said that if she had denied it,

there would have been further investigation "to get to the heart

of it," and at that point there may have been an attempt to find

the family court records.[19]  Lefebure Dep. at 60:1–10.

Stephens also testified that it felt he was "talking

to a brick wall" when he asked Lefebure about the decision.

Stephens Dep. at 60:7–20.  "I may have asked him [Lefebure] are

you sure that this is something that we need to do based on –

because I believe it was whether she was pregnant or not?  And

he said it makes no difference.  If you falsify your testimony,

then you falsify your testimony."  Stephens Dep. at 60:2–6.

Stephens said he knew he was going to get the blame for

plaintiff being placed on the Giglio list, and, further, that he

---

[18] "Q. In her case, when you presented her with the issue or the
evidence, she said, Yeah, I did that?  A. Yeah."  Lefebure Dep.
at 59:21–24.

[19] While the Giglio matter is dealt with herein in the Count II
retaliation analysis, infra, at section III.B.2, it is
noted that, despite the plaintiff's disclaimer, plaintiff created the
problem at the time of her hiring, and, when confronted, she
says she went into a rage and "bottled it" thus failing to take
that opportunity to explain why she believed the result should
have been otherwise.

was concerned at the timing of the incident, as there was an upcoming arson case which plaintiff responded to, and he "was concerned that that was going to have a terrible pressure on that case to get that case dismissed." Stephens Dep. at 60:7–20.

Despite the clear testimony of Stephens, Cross, and Lefebure, plaintiff continues to doubt that the disclosure was not directed by Stephens, citing Stephens' misogynistic attitude and the clear and established chain of command. Pl.'s Resp. to Stephens 9; see Cross Dep. at 13:24–14:4 ("He [Stephens] had no knowledge of it."); Sims Dep. at 22:14 (testifying he only learned of it after the fact); Lefebure Dep. at 85:15–21.

Thereafter, Lefebure notified counsel for current and pending criminal matters in Wood County that plaintiff had been placed on the Giglio list. Lefebure Dep. [ ]; Sims & WCC Mem. Supp. 4.

When asked about the effect of being placed on the Giglio list, plaintiff responded:

> [I]t basically can ruin my career as an officer. I'm of no use to testifying in court because I'm depicted as a liar. . . . High crime situations I'm of no use. Obviously if I make a traffic stop and someone ran a red light, I can testify in that, but when it comes to big cases, I'm of no use. They'll never use me so I've been placed in a box of no use.

Pl. Dep. at 244:10–245:7.

In plaintiff's deposition, she testified to three additional incidents, not included in the complaint, that she perceived as retaliatory.  Those three incidents consist of an email reprimand from Sims, two occasions when plaintiff felt she was not supported by other deputies while responding to a call (one involving backup and the other involving a status check), and the denial of plaintiff's request to be the department's defensive tactics coordinator.

First, on November 10, 2021, she was reprimanded in an email by Sims for failing to appear at an abuse and neglect hearing in circuit court.  Pl. Dep at 184:15–189:1; Email from R. Sims to T. Hewitt, Nov. 10, 2021, ECF No. 82-12 at 3; Sims & WCC Mem. Supp. 8.  Plaintiff agreed that Sims was warranted in bringing to her attention the missed court appearance, but felt there was unnecessary hostility: "All of the hostility prior to this e-mail and the fact that I was never made aware that I had missed any before and he clearly states it was brought to his attention and it was never brought to mine."  Pl. Dep. at 186:15–19.  Plaintiff said one of the reasons she was upset by this is that Sims mentioned in the email other incidents in which plaintiff had missed a court appearance, but that she had not been informed of these issues prior.[20]  She states that she

---

[20] Email from Sims to plaintiff:

did not intend to miss the court hearing and admitted it was her

responsibility to know when she had to be in court, but

explained that she was not notified of the subpoena or otherwise

told of the court session that day as she normally was, which is

> It was brought to my attention that on November 8th you failed to appear for an Abuse and Neglect Hearing in Circuit Court. . . . As a Deputy Sheriff with this department we are required to appear for all court hearings for which we are Noticed or Subpoena'd.
>
> It is a dis-service to this community and especially to the victims of this incident to allow the defendant the chance to walk away from their crime because a Law Enforcement Officer failed to show for their hearing.
>
> I've been advised this has happened on more than one occasion so this needs to be addressed, as should it continue then disciplinary action will have to be sought.
>
> As such I need an explanation as to why this Hearing on November 8th was missed.

Sims Email Nov. 10, 2021.  Plaintiff responded:

> It has never been brought to my attention that this has occurred on more than one occasion. Nor did anyone from the prosecutors [sic] office reach out to me that day.
>
> On November 8th I was in a therapy session trying to heal from the hostile work environment created by Sheriff Stephens and yourself, that hostile work environment is a dis-service to this community.
>
> In the future I will be sure to attend any and all scheduled court appearance [sic].

Email from Pl. to R. Sims, Nov. 11, 2021, ECF No. 82-12 at 3.

how she came to miss it.  Pl. Dep. at 188:11–189:1.  Indeed,
Cross, in his deposition, testified that he had tried to write
up plaintiff for missing three DUI hearings but "Stephens
basically told me that he wasn't going to do anything about it."
Cross Dep. at 16:15–17:19.  Inasmuch as Sims' notice focused on
her failure to attend a court hearing, and plaintiff admitted it
was her responsibility to keep track of the dates and times of
such events, this incident is disregarded.

Second, plaintiff testified that on two occasions,
consisting of one status check and one backup failure, one while
Stephens was still in office and one after his retirement, other
deputies failed to assist her during calls.  Pl. Dep. 113–120,
242–44.  One incident involved not being asked for a status
check and the other involved Cross not responding or assisting
with a domestic violence call.  Pl. Dep. at 114:7–11.

In the status check incident, plaintiff says she was
responding to a disorderly subject call, by herself, at
approximately 2:00 a.m.; was on the scene for ten to fifteen
minutes; and never received a status check.[21]  Pl. Dep. at

---

[21] Plaintiff explained about status checks:

> It's common c[o]urtesy and it's what we
> typically do for usually a second officer to
> respond to disorderly suspicious subjects,
> especially on night shift.

115:17–6.  Plaintiff says status checks are a common courtesy in such situations and "[h]ad that been any other individual in the department they would have got a status check," especially considering that she was alone, on foot, and in an industrial area at night.  Pl. Dep. at 115:17–116:6, 117:7–22.  She testified that this incident occurred when Stephens was still in office.  Pl. Dep. at 118:7–10.  When asked, Stephens and Sims both said they were not aware of the allegations and that plaintiff never complained to them about not receiving backup. Stephens Dep. at 150:2–17; Sims Dep. at 77:1–2.  If plaintiff is correct the status check failure may be a matter of consequence.

The backup incident, where Cross allegedly failed to provide backup to plaintiff on a domestic violence call, resulted in an internal investigation.  Plaintiff testified that she responded to the call from her house (approximately twenty minutes from the scene), while Cross, who was at the office and about five to ten minutes away from the scene, never responded.

---

> Usually all calls are two man call[s], however, I was dispatched to that call and it is of common nature that we get status checked, especially when someone's been on a call for over five minutes.

Pl. Dep. at 243:15–22.  According to Stephens, it should be the responsibility of the shift supervisor to determine the appropriate number of deputies to respond to a call, but there is nothing written into department policy as to how to make that determination.  Stephens Dep. at 166:5–22.

Pl. Dep. at 114:12–18.  "I had to deal with a domestic violence
call by myself for 20 minutes and everyone on that department
knows that domestic violence situations are one of the most
dangerous calls you can go to."  Pl. Dep. at 114:19–22.
Plaintiff filed a complaint and an internal investigation
followed.  Pl. Dep. at 119:1–7.  She said, "they wanted to put a
letter in his file, but he [Cross] fought it and it went to,
like, an association hearing . . . and they decided he did
nothing wrong."  Pl. Dep. at 119:8–20.  Cross said the sheriff
attempted to write him up for this incident following the
internal investigation, but that Cross contested it to a review
board and it was overturned.  Cross Dep. at 23:12–17.

On the issue of providing backup, Stephens said the
following:

> Q. If Tasha responds to a hot call . . . is
> there ever a circumstance where it would be
> appropriate for another deputy to refuse to
> report as her backup?
>
> A. None.  None.  That would be disciplinary.
> . . . Officer's safety is the primary one.
>
> Q. And it doesn't matter whether you get along
> with the other deputy, like the other deputy,
> hate the other deputy, it's your job.
>
> A. Yes, sir.
>
> Q. And it's your job to back them up regardless
> of how you feel about them?
>
> A. And you know, in my 43 years, I've never
> heard that, where somebody [says], you know,
> screw that.  That's Stephens.  I'm not going

> to back him up. . . . [T]hey may not like you,
> but they're coming.

Stephens Dep. at 167:8–168:5.  Plaintiff testified that she was
not sure whether it occurred while Stephens was still in office,
but it was likely after Stephens retired; Cross testified that
it occurred after Stephens' retirement, under Sheriff Woodyard's
tenure.  Pl. Dep. at 118:7–119:4, 119:24–120:1; Cross Dep. at
23:12–17.  The court deems the backup incident as having been
fully dealt with and satisfied by the defendants.

    Third, plaintiff says that she was denied the
opportunity to be the defensive tactics instructor despite her
qualifications, and instead a male deputy was appointed.  Pl.'s
Resp. to Stephens 5.  However, plaintiff testified that this
likely occurred in 2019 or 2020 and that she could not remember
whether it was before or after the 2020 Settlement; Stephens
testified that it occurred around 2018; and Sims testified
confidently that it was in 2018, when plaintiff was still on
probation and directly out of the academy.  Pl. Dep. at 225:2–
10; Stephens Dep. at 147:21–22; Sims Dep. at 72:9–16.  Thus, the
court will not consider this incident.

    Overall, plaintiff alleges that Stephens created a
misogynistic atmosphere in the office that encouraged others to
behave the same.  Indeed, during Stephens' deposition, when
asked whether "it [would] be inappropriate in the workplace to

refer to a woman's butt?," Stephens' lackluster response was, "I guess it would be inappropriate.  You've educated me."  Stephens Dep. at 117:11-14.  Plaintiff further remarked, "I'm a woman [at] the sheriff's department, we should be seen and not heard. That's the kind of environment that has been — it's like a culture thing there."  Pl. Dep. at 265:11-14.

        Plaintiff testified that Stephens has not called her a "whore" in her presence since the 2020 Settlement.  Pl. Dep. at 252:19-253:12.  When asked during his deposition whether he had ever called plaintiff a "whore," Stephens admitted that he had, but could not recount how many times and under what circumstances.  Stephens Dep. at 116:2-15.  "[I]t was only a couple of times and the only reason I brought to recollection, I may have even said it and didn't think of it at the time, but was from Mathen[y] and other people saying that I did." Stephens Dep. at 116:11-15.  Stephens testified that at least some of those instances occurred at the sheriff's office and could have been within earshot of other employees.[22]  Stephens Dep. at 116:20-117:6.  Stephens said one instance "supposedly

_____

[22] When asked if any of those occurrences would have been within earshot of employees at the sheriff's office, Stephens initially responded that they wouldn't, but then added: "Of course, if they're walking down the hall at the office, my door was always open, so yeah.  It could have very well been there [at the sheriff's office], but to have distinct recollection of that, I do not."  Stephens Dep. at 116:23-117:6.

occurred at Columbo's restaurant" – which is collaborated by
other testimony and which occurred prior to the 2020 Settlement
– and that he was sure he called her a "whore" while he was in
his office at one point.  Stephens Dep. at 157:16–21.

Cross testified that he never heard Stephens call
plaintiff (or anyone else) a "whore," but that he was aware that
others in the office had made complaints that plaintiff had been
called a "whore."  Cross Dep. at 19:20–20:13.  Cross did not say
when these alleged comments were said to have taken place.
Cross Dep. at 19:20–20:6.  Sims testified that he never heard
Stephens refer to plaintiff as a "whore."  Sims Dep. at 33:23–
34:1.  Sims said he was not aware that plaintiff had been called
a "whore" on any occasions other than the disparaging comments
incident.  Sims Dep. at 65:20–24.

Bussey also testified that he never heard Stephens
call any woman a whore while working in the department, never
heard Stephens say anything offensive while working in the
department, but was generally aware of Stephens saying offensive
things to others in the department as part of his internal
investigation during or after July 2021, in response to the
disparaging comments incident.  Bussey Dep. at 9:5–19.  "When I
was doing the internal investigation, some testimony from people

I interviewed indicated that he [Stephens] had said some [offensive] things."[23]  Bussey Dep. at 9:17–19.

Plaintiff says these events cumulatively created a hostile work environment and several were retaliatory.  She testified that, as a rough estimate, she took off approximately "[t]en days out of the month or more" due to the stress that she endured in the department.  Pl. Dep. at 139:19–140:8.  Once her sick days had been used up, those ten or so days a month that plaintiff took off were unpaid.  See Pl. Dep. at 248:3–12.  Additionally, she says she suffered from stress, anxiety, and depression as a result of this environment, going once to the Camden-Clark Emergency Room, and once to MedExpress about these issues.  Pl. Dep. at 141:3–142:1.  Plaintiff and Tim Allen also went to a marriage counselor, once every two weeks, beginning before the 2020 Settlement and continuing until October 2021.[24]

---

[23] Bussey characterized Stephens thusly: "He [Stephens] was — he was difficult to work for.  So what — as far as me hearing him degrade anyone in person, no.  It was just some of his day-to-day interactions that were not something that I would do.  He was very hot and cold, overbearing.  That's how I'd call it." Bussey Dep. at 10:24–11:5.  Bussey felt morale amongst the deputies was low at the department and that this was due, in part, to Stephens' overbearing nature.  Bussey Dep. at 11:6–19.

[24] Plaintiff referenced other stressors, such as allegedly — but unspecified — falsified domestic violence protective orders causing some of the children to stay with other family members. Pl. Dep. 144:20–146:16.  When asked whether this was the reason for the counseling, however, plaintiff insisted the stress from work was the real reason: "The real reason was . . . just because of all the stress at work[;] it caused tension at home

Pl. Dep. at 143:16–144:19, 147:3.  Plaintiff says her work
performance suffered as well, "due to all the stress and
anxiety.  Like, I feel like I used to be a pretty good deputy
that would go out there and try and do my job properly, but when
you're under stress it's difficult to perform efficiently."  Pl.
Dep. at 151:9–13.  Plaintiff says she still responded to her
calls, but that she went from being very productive to doing the
bare minimum.  Pl. Dep. at 151:14–152:10

      Stephens also mentioned that plaintiff had attendance
issues, beginning at some point after the 2020 Settlement.
Stephens Dep. at 94:33–16.  When asked if he knew why she was
having attendance issues, Stephens speculated:

> A.  There were – obviously she was having
> issues about the deputies or her coworkers.  I
> was told that there was issues between her and
> Tim at home.  I was told that there were times
> that CPS got involved in some things.  I know
> that prior to that, her and her husband had
> had some issues and the state police had been
> called to her house.
>
> . . .
>
> Q. Do you know whether any of her attendance
> issues were related to the issues in this
> lawsuit in terms of her claims that she was
> being retaliated against by you or others
> within the sheriff's department?

---

and we wanted to learn how to deal with that properly and we
wanted some outside help."  Pl. Dep. at 146:21–24.  The
relationship counseling began before the two were married
(married December 2, 2021).  Pl. Dep. at 25112–24.

> A. I don't have any hard knowledge on that.  I
> had my speculation that that's what it was. .
> . . And she just didn't feel like coming in
> and deal[ing] with it.   That was just merely
> my speculation.

Stephens Dep. at 94:20–95:22.

Due to plaintiff's renewed complaints, as well as complaints by several other female deputies, the Commission hired Booth Goodwin in late October or early November 2021 to conduct another investigation of allegations made against Stephens.  Lefebure Dep. at 13:10–21; Couch Dep. at 20:16–21. The Goodwin investigation considered those complaints, and involved, in part, determining whether there were grounds to remove Stephens from office.[25]  Lefebure Dep. at 13:10–21.

Stephens submitted a letter to the Commission on November 12, 2021, announcing his retirement, effective December 1.  Couch Dep. at 55:23–56:4.  This concluded the need of the Goodwin investigation; the investigation was never completed, and there was no final report.  Couch Dep. at 50:5–14; see also Lefebure Dep. at 39:2–14.  Sims stayed on with the department for a short time after Stephens' retirement before retiring

---

[25] As an elected official, there are three ways the sheriff can be removed from office, one of which requires initiation by the County Commission; the removal process can also be initiated by the county prosecutor or a petition by private citizens. Lefebure Dep. at 41:12–42:8.

himself, but was no longer Chief Deputy after Stephens left. Stephens Dep. at 111:17-24.

In June 2023, plaintiff resigned from the Wood County Office of the Sheriff.  Pl. Dep. at 19:4-8.  In July 2023, plaintiff and her husband moved to Florida, where plaintiff currently works as a police officer with the Cape Coral Police Department.  Pl. Dep. at 19:7-23.

B.   Procedural History

Plaintiff signed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on January 24, 2022 and an Amended Charge of Discrimination on March 31, 2022. See EEOC Charge, ECF No. 14-1 at 2; Amended Charge, ECF No. 14-2.  The EEOC issued a Determination and Notice of Rights on June 27, 2022, informing plaintiff that the EEOC would not be proceeding with its investigation, that it was dismissing her charge, and that she had the right to file a lawsuit within ninety days.  EEOC Letter, ECF No. 1-1.

Plaintiff filed her complaint (ECF No. 1) on September 13, 2022.  The complaint asserted four counts, the following two of which still stand: Count I — gender discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. section 2000e to 2000e-17, Compl. ¶¶ 57-61; and Count II — violations of the West Virginia Human

44

Rights Act (sometimes, "the Act"), West Virginia Code section 5-11-1, et seq., Compl. ¶¶ 62–66.  The matter is in federal court because of the federal Title VII claim.  The complaint also listed the Sheriff's Office and Lefebure as defendants (both of whom have been dismissed), in addition to the remaining three defendants, Stephens, Sims, and the Commission.

Defendants filed answers on October 17, 2022, (Stephens, ECF No. 9) and October 18, 2022, (Lefebure, Sims, the Commission, and the Sheriff's Office, ECF No. 10).

On November 8, 2022, two motions to dismiss were filed, one by Stephens (ECF No. 13) and one by Sims, the Sheriff's Office, the Commission, and Lefebure (ECF No. 15).  In its memorandum opinion and order (ECF No. 59) of July 12, 2023, the court dismissed defendant Sheriff's Office and dismissed Count III (deprivation of due process) and Count IV (intentional infliction of emotional distress).  The court also dismissed Count I as to Sims, Lefebure, and Stephens, leaving only the Commission in that count; dismissed Lefebure from the Count II West Virginia Human Rights Act hostile work environment claim (thus dismissing Lefebure from the action entirely), leaving only Stephens, Sims, and the Commission in that count; and dismissed the Harless claim, which was also originally included in Count II.  As to Count I, the court found the allegations

45

concerning the pregnant clothing, childcare, and shift exchange incidents were not properly before the court, being confined as they were by the EEOC claim; in addition, those complaints are deemed meritless, for the reasons set forth above, and the court will not consider them regarding Count II.  The court granted plaintiffs judgment on the pleadings regarding the disparate treatment claim in Count II.

And so Count I remains solely against the Wood County Commission on the plaintiff's Title VII hostile work environment claims for sex discrimination and retaliation, and Title VII discrete retaliation claim related to the Giglio list incident. Count II remains against defendants Stephens, Sims, and the Commission on the plaintiff's West Virginia Human Rights Act hostile work environment claims for sex discrimination and retaliation.

The parties subsequently engaged in discovery.  On December 7, the two motions for summary judgment under consideration were filed: Sims and the Commission filed a motion for summary judgment ("Sims & WCC Mot. Summ. J.," ECF No. 82) on all remaining counts, being Counts I and II, and an accompanying Memorandum in Support ("Sims & WCC Mem. Supp.," ECF No. 83); and Stephens filed a motion for summary judgment ("Stephens Mot. Summ. J.," ECF No. 84) on Count II an accompanying Memorandum in

Support ("Stephens Mem. Supp.," ECF No. 85).  Plaintiff filed a
response to the motion by Sims and the Commission ("Pl.'s Resp.
to Sims & WCC," ECF No. 89) and a response to the Stephens
motion ("Pl.'s Resp. to Stephens," ECF No. 88), both on December
21, 2023.  Stephens replied ("Stephens Reply," ECF No. 90) on
December 28, 2023, and Sims and the Commission replied ("Sims &
WCC Reply," ECF No. 91) on January 2, 2024.


## II. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows
that there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law."  Fed. R.
Civ. P. 56(a).  Courts at this stage do not resolve disputed
facts, weigh evidence, or make determinations of credibility.
See Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir.
1995); Sosebee v. Murphy, 797, F.2d 179, 182 (4th Cir. 1986).
"Material" facts are those necessary to establish the elements
of a party's cause of action.  See Anderson v. Liberty Lobby,
Inc., 477 U.S. 242, 248 (1986); see also The News & Observer
Publ'g Co. v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576
(4th Cir. 2010).  A dispute of material facts is "genuine" if,
in viewing the record and all reasonable inferences drawn
therefrom in the light most favorable to the non-moving party, a
reasonable fact-finder could return a verdict for the non-moving

party.  See Anderson, 477 U.S. at 248.  The moving party is entitled to summary judgment if the record, as a whole, could not lead a trier of fact to find for the non-moving party.  See Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson, 477 U.S. at 247–48 (emphasis in original).  "[A] party opposing a properly supported motion for summary judgment '"may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."'"  Id. at 248 (quoting First Nat'l Bank of Ariz. v. City Servs. Co., 391 U.S. 253 (1968) (quoting Fed. R. Civ. P. 56(e))) (ellipses in original); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 584 (1986) (the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts").  A non-movant who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" will lose at summary judgment because "the nonmoving party has failed to make a sufficient showing on an essential element of her case

with respect to which she has the burden of proof." <u>Celotex</u>
<u>Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).


<u>III. ANALYSIS</u>

A.   <u>Count I: Hostile Work Environment Claims for Sex</u>
     <u>Discrimination and Retaliation in Violation of Title VII</u>

     To reiterate, Count I — Title VII violations — remains
as to the Commission and only as to the hostile work environment
claims for sex discrimination and retaliation, and a discrete
retaliation claim related to the <u>Giglio</u> list incident.  As the
Commission is the only remaining defendant under Count I, the
court begins by determining whether the Commission can be held
liable as an employer or joint employer of either or both
Sheriff Stephens and Chief Deputy Sims under Title VII.

     Title VII makes it unlawful for an employer to
discriminate against an individual due to the individual's race,
color, religion, sex, or national origin.  42 U.S.C. § 2000e-
2(a)(1).  "An entity can be held liable in a Title VII action
only if it is an 'employer' of the complainant."  <u>Butler v.</u>
<u>Drive Auto. Indus. of Am., Inc.</u>, 793 F.3d 404, 408 (4th Cir.
2015).  An "employer" as defined by Title VII is a "person
engaged in an industry affecting commerce who has fifteen or
more employees for each working day in each of twenty or more

49

calendar weeks in the current or preceding calendar year, and
any agent of such person." 42 U.S.C. § 2000e(b). An 'employee'
is 'an individual employed by an employer.'" 42 U.S.C. §
2000e(f).

Both the United States Supreme Court and the Fourth
Circuit Court of Appeals have acknowledged "definitions of
'employer' and 'employee' in federal law are often circular and
'explain[] nothing.'" Butler, 793 F.3d at 408 (quoting
Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 323 (1992))
(alteration in original).

Thus, the Commission can only be liable to plaintiff
under Title VII if it is plaintiff's employer.[26] The Commission
asserts that it is not her employer because it has exercised no
supervisory control over plaintiff, Stephens, or Sims, and thus
cannot be liable for the alleged Title VII violations. See Sims
& WCC Mem. Supp. 19-20. Plaintiff counters that the Commission
is either an employer or co-employer of the Wood County deputy
sheriffs and thus can be vicariously liable for the alleged
Title VII violations. Pl.'s Resp. to Sims & WCC 11. The
parties refer generally to things such as ability to hire and
fire, who pays the deputies' salaries, and supervisory control,

---

[26] What matters is not whether the Commission is the Sheriff's
employer, but whether it is plaintiff's.

but neither point to any federal caselaw used to determine whether a party is an employer in the federal Title VII context. The parties briefly discuss <u>Amoroso v. Marion County Commission</u>, 305 S.E.2d 299 (W. Va. 1983), a state court case which can only bear on this federal question insofar as it defines elements of the relationship between the Commission and the deputy sheriffs; it cannot instruct on <u>how</u> to determine who qualifies as an employer under Title VII.

To address this issue in the Title VII context, the Fourth Circuit in <u>Butler v. Drive Automotive Industries of America, Inc.</u>, 793 F.2d 404, joined several other circuit courts of appeal in adopting the joint employment doctrine. <u>See</u> <u>id.</u> at 408–09. Under the joint employment doctrine, "two parties can be considered joint employers and therefore both be liable under Title VII if they 'share or co-determine those matters governing the essential terms and conditions of employment.'" <u>Id.</u> (quoting <u>Bristol v. Bd. of Cnty. Comm'rs</u>, 312 F.3d 1213, 1218 (10th Cir. 2002) (en banc)).

To determine whether an entity is a joint employer, the Fourth Circuit in <u>Butler</u> adopted the "hybrid test," articulating the following nine factors for courts to consider:

> (1) authority to hire and fire the individual;
> (2) day-to-day supervision of the individual,
> including employee discipline; (3) whether the
> putative employer furnishes the equipment used

> and the place of work; (4) possession of and
> responsibility over the individual's
> employment records, including payroll,
> insurance, and taxes; (5) the length of time
> during which the individual had worked for the
> putative employer; (6) whether the putative
> employer provides the individual with formal
> or informal training; (7) whether the
> individual's duties are akin to a regular
> employee's duties; (8) whether the individual
> is assigned solely to the putative employer;
> and (9) whether the individual and putative
> employer intended to enter into an employment
> relationship.

Id. at 414. While "none of these factors are dispositive and .

. . the common-law element of control remains the 'principal

guidepost' in the analysis," the first three factors are the

most important. Id. The factors are not intended to be applied

mechanically, but rather to "prove a framework to elicit the

true nature of a putative employment relationship." Greene v.

Harris Corp., 653 F. App'x 160, 164 (4th Cir. 2016).

Butler adopted the joint employment doctrine in the

context of determining whether the plaintiff, who was directly

employed by a staffing agency and worked in a factory, was also

employed by the manufacturing factory to which she was assigned,

for purposes of Title VII. Butler, 793 F.3d at 415. The test

was designed for situations involving staffing agencies or other

contractors assigned to third-parties to prevent those third-

party employers from escaping liability. Id. at 408. However,

the basis for adopting the joint employer doctrine applies

52

equally to the present action: "The joint employment doctrine .
. . prevents those who effectively employ a worker from evading
liability by hiding behind another entity, such as a staffing
agency.  Given Title VII's remedial intent, employers should not
be able to 'avoid Title VII by affixing a label to a person that
does not capture the substance of the employment relationship.'"
Id. at 410 (quoting Schwieger v. Farm Bureau Ins. Co. of Neb.,
207 F.3d 480, 484 (8th Cir. 2000); citing Sibley Mem'l Hosp. v.
Wilson, 488 F.2d 1338, 1341 (D.C. Cir. 1973)).

    In adopting the doctrine, the court in Butler found it
served Title VII's purpose of eliminating employment
discrimination and remarked: "Title VII should be liberally
construed in light of its remedial purpose."  Id. at 409 (citing
Lucindo v. Cravath, Swaine & Moore, 425 F. Supp. 123, 126
(S.D.N.Y. 1977); Hernandez v. Aldridge, 866 F.2d 800, 803 (5th
Cir. 1989), vacated on other grounds sub nom. Hernandez v. Rice,
494 U.S. 1013 (1990); Arnold v. Burger King Corp., 719 F.2d 63,
65 (4th Cir. 1983)).  In effectuating the "broad, remedial
purpose of Title VII which militates against the adoption of a
rigid rule strictly limiting 'employer' status under Title VII
to an individual's direct or single employer," the Butler court
agreed with the Eighth Circuit, emphasizing that the definition
of "employer" should be afforded "liberal construction."  Id. at
409–10 (quoting Baker v. Stuart Broad. Co., 560 F.2d 389, 391

(8th Cir. 1977); <u>Magnuson v. Peak Tech. Servs., Inc.</u>, 808 F.
Supp. 500, 508 (E.D. Va. 1992)).  "The object of the joint
employment doctrine is to determine whether a putative employer
'exercise[s] significant control over the same employees.'"  <u>Id.</u>
at 410 (quoting <u>Bristol</u>, 312 F.3d at 1218).

        The joint employment doctrine and the hybrid test have
been applied throughout the Fourth Circuit, sometimes to
situations beyond the original staffing agency or contractor
scenario.  <u>See</u>, <u>e.g.</u>, <u>Smith v. CSRA</u>, 12 F.4th 396, 414 (4th Cir.
2021) (applying <u>Butler</u> factors to Americans with Disabilities
Act case and determining federal Drug Enforcement Agency lacked
requisite control and was not joint employer of plaintiff who
was directly employed by government contractor); <u>Crump v.
TCoombs & Assocs., LLC</u>, No. 2:13cv707, 2015 WL 5601885, *16—24
(E.D. Va. Sept. 22, 2015) (applying <u>Butler</u> factors and
determining U.S. Navy was joint employer of physician directly
employed by contractor); <u>Jones v. Blair Wellness Ctr., LLC</u>, Civ.
No. ADC-21-2606, 2022 WL 3992656, *4—6 (D. Md. Sept. 1, 2022)
(applying <u>Butler</u> factors and determining private entity was not
joint employer of plaintiff hired by talent management firm);
<u>Wright v. Mountain View Lawn Care, LLC</u>, No. 7:15-cv-00224, 2016
WL 1060341, *3—7 (W.D. Va. Mar. 11, 2016) (applying <u>Butler</u>
factors and determining franchisor did not exercise the

54

requisite control to be joint employer of employee who directly worked for franchisee).

In the context of government employees or constitutional officers, some courts have refused to apply the joint employer doctrine or done so begrudgingly. In Leuenberger v. Spicer, No. 5:15-cv-00036, 2016 WL 355090 (W.D. Va. Jan. 28, 2016), the district court for the Western District of Virginia determined that the joint employer doctrine did not apply where plaintiff was a deputy commonwealth's attorney, her direct employer was  the commonwealth's attorney, and the putative employer was the county. 2016 WL 355090, at *12-13. The court in Leuenberger wrote that the joint employer doctrine was "ill suited to the facts of th[e] case because it d[oes] not involve the situation where one entity is using an employee of another entity. Rather, it involves an employee who works only for one entity but who has some aspects of her employment managed by another entity." Id. at *13. Ultimately, the court still considered the issue of control in light of the Butler factors, and determined that the county did not have the requisite control to be considered a joint employer of plaintiff — the doctrine did not apply because there was not sufficient control, not because the doctrine could not cover such a situation.

In <u>Kellum v. Isle of Wight County, Virginia</u>, No.
2:18cv543, 2020 WL 3164962 (E.D. Va. Feb. 13, 2020), the
district court for the Eastern District of Virginia considered
whether the county and the county's Commissioner of Revenue (a
constitutional officer) were employers under the Americans with
Disabilities Act .  2020 WL 3164962, at *7.  The court
questioned whether the doctrine applied in cases involving
constitutional officers and discussed <u>Leuenberger</u>, but
ultimately considered the issue in light of the <u>Butler</u> factors.
<u>Id.</u> at *10.  The court found the county was not a joint employer
of the plaintiff: "Although aspects of Kellum's employment were
managed by the County, such as those relating to human
resources, the most functional aspects of Kellum's employment
were controlled by Gwaltney as the Commissioner of Revenue."
<u>Id.</u>

In other cases, courts have applied the joint
employment doctrine and <u>Butler</u> test to similar scenarios without
reservation.  <u>See</u>, <u>e.g.</u>, <u>Marshall v. Anne Arundel Cnty., Md.</u>,
Civ. No. ELH-18-74, 2019 WL 568676, at *1-2, 8 (D. Md. Feb. 12,
2019) (court found plaintiff sufficiently alleged county was her
joint employer to survive motion to dismiss where plaintiff, an
employee of the Office of the State's Attorney for Anne Arundel
County, attempted to sue the county on allegations of
discrimination in violation of the Americans with Disabilities

Act, the Age Discrimination in Employment Act, and the Maryland Fair Employment Practices Act); Butler v. Spotsylvania Cnty. Gov't, No. 3:19cv950 (DJN), 2020 WL 2572801, at *1, 5–6 (E.D. Va., May 21, 2020) (court applied doctrine where plaintiff, an employee of the Commissioner of Revenue for Spotsylvania County, also sued the county government, finding county was not joint employer).  Notable is Ensor v. Jenkins, Civ. No. ELH-20-1266, 2021 WL 1139760 (D. Md. Mar. 25, 2021), in which the district court for the District of Maryland applied the joint employment doctrine and Butler test to similar facts as the instant case, where the plaintiff was a sergeant at the county sheriff's office and attempted to sue the county as well under Title VII. 2021 WL 1139760, at *42.  The Ensor court found plaintiff alleged the county exerted sufficient control to survive a motion to dismiss on the issue of whether the county was a joint employer of plaintiff.

        The court finds it appropriate to apply the Butler test to determine whether the Commission was plaintiff's joint employer.  The elements that the court must analyze, focusing on control, are neatly laid out in Butler.  Further, no party has proffered a superior way to consider the issue, while the Butler test is designed to test whether a third-party putative employer indeed wielded sufficient authority to be considered a joint

employer, which is precisely the question with which the court
is faced.

The first factor is whether the Commission had
authority to hire and fire.  The sheriff hires deputies "by and
with the advice and consent of the county commission."  W. Va.
Code. §§ 7-7-7(a)-(b), (h); 7-14-17(a); see also Sims & WCC Mem.
Supp. 19.  The Commission's approval of a deputy is essentially
a rubber stamp; they have no input into who is hired and can
only refuse to approve a proposed hire if it would be illegal in
some way.  Couch Dep. at 78:4-79:4; see also Sims Dep. at 67:14-
18.  Although, by code, firing is entirely within the purview of
the sheriff, Stephens testified that he went through Prosecutor
Lefebure and the county commission if he needed to fire a
deputy.  See W. Va. Code § 7-7-7; Stephens Dep. at 69:19-20,
70:1-4, 73:18-74:2.  Because potential liability accompanies
some firings, it is understandable that a sheriff would do so.
Inasmuch as the hiring and firing is essentially done by the
sheriff, the first factor weighs against plaintiff.

The second factor, whether the Commission had day-to-
day supervision of plaintiff, including disciplining plaintiff,
weighs heavily against the Commission being plaintiff's joint
employer.  Commissioner Couch testified that the day-to-day
operations at the sheriff's department are run by the sheriff;

the Commission doesn't tell the sheriff how to manage his staff
and, indeed, cannot "demand the sheriff's employees do
anything."[27]  Couch Dep. at 14:13–15:12, 38:3–4.  Plaintiff and
Sims similarly testified that the Commission did not exercise
any control over shifts, day-to-day operations, or the like.
Pl. Dep. 196:13–197:24; Sims Dep. at 67:23–64:3.

        The third factor, whether the Commission furnishes the
equipment used and the place of work, weighs in plaintiff's
favor.   Couch testified that the Wood County Commission has
more control over county affairs than any other commission in
the state, and attributed this to the amount of control it
exerts over the county's budget.[28]  Couch Dep. at 11:1–10.  Thus,
everything in the sheriff's office would be approved by the
Commission.

        These first three factors, which the Butler court
deemed the most important of the nine, weigh against the
Commission being plaintiff's joint employer.  Only two of the

----

[27] The Commission only directly oversees the Commission staff,
the community corrections program, and 9-1-1 and
telecommunicators.  Couch Dep. at 11:1–10.

[28] "We meet more than any other commission in the state.
Charleston meets twice a month.  We meet twice a week . . .
[e]very single week."  Couch Dep. at 8:1–4.  Explaining why: "We
have more control.  We sign off on every requisition over $100.
So a county our size with a $32 million budget, that's a stack
of papers every week."  Couch Dep. at 8:6–8

five remaining factors are applicable. The fourth factor, possession of and responsibility over the individual's employment records, including payroll, insurance, and taxes, weighs in plaintiff's favor, as the Commission approved the deputy sheriff's salaries, allotted the budget to pay the deputy sheriff's salaries, and provided plaintiff's employment benefits; the Commission is listed as an employer on the deputy sheriff's W-2 tax forms. See Sims Dep. at 3; W. Va. Code § 7-7-7, Pl.'s Resp. to Sims & WCC 9. However, plaintiff's personnel file is maintained by the Sheriff's Office. The sixth factor, whether the putative employer provides the individual with formal or informal training, weighs against plaintiff. While the Commission appropriates money for training, if necessary, the Sheriff's Office orchestrates the actual training. For instance, the sexual harassment training required by the Sheriff's Office in the wake of the 2020 Settlement was paid out of the Sheriff's Office budget as approved by the Commission, but the office itself organized the training. See Stephens Dep. at 135; W. Va. Code § 7-7-14.

The Butler factors support the conclusion that the Commission is not a joint employer of plaintiff for purposes of Title VII. Indeed, other courts analyzing similar issues have come to the same conclusion, albeit with slightly different state laws governing the relationship between the county and the

office or department which directly employed the plaintiff.  In

Kellum and Spotsylvania County, the courts found that an

employee of the Commissioner of Revenue (a constitutional

officer), could not sustain a claim against both the

Commissioner and locality (i.e., the county), as only the

Commissioner held the requisite control over the employee.

Kellum, 2020 WL 1304083, at *10; Spotsylvania Cnty., 2020 WL

2572801, at *6.  Other courts only reviewed the issue

preliminarily: Ensor held that the plaintiff sergeant had

alleged sufficient control to survive a motion to dismiss but

that the county was free to renew its argument in a motion for

summary judgment after discovery, 2021 WL 1139760, at *46, and

Marshall similarly held that the plaintiff had alleged

sufficient facts to survive a motion to dismiss the county, 2019

WL 568676, at *9.

        The court in Butler emphasized multiple times the

importance of control in making the ultimate determination of

whether the putative employer is indeed a joint employer.  793

F.3d [pincite].  Indeed, the purpose of the hybrid test is to

assess "whether a putative employer exercises significant

control over" the employee.  Id. at 410 (quoting Bristol, 312

F.3d at 1218) (internal quotation marks omitted).  Although the

Commission has a great deal of control over the finances of the

county – and thus the Sheriff's Office – it does not exercise

any control over the activities of the deputy sheriffs themselves.  It does not make schedules, determine how calls are responded to, promote or demote, approve vacation time, set office policies, or interview applicants.

Having applied Butler's hybrid test and reviewed the uncontested evidence as to the Commission's involvement with the deputy sheriffs, the court concludes that the Commission does not exercise the control necessary to be considered a joint employer of the Wood County Deputy Sheriffs.  Thus, plaintiff's Count I must be dismissed as the Commission — the only remaining defendant to that count — cannot be liable to plaintiff under Title VII as it was not her employer or joint employer.

B.   Count II: Hostile Work Environment Claims for Sex
      Discrimination and Retaliation in Violation of the West
      Virginia Human Rights Act

Count II remains against defendants Stephens, Sims, and the Commission on the plaintiff's West Virginia Human Rights Act hostile work environment claims for sex discrimination and retaliation.

The West Virginia Human Rights Act prohibits employers from "discriminat[ing] against an individual with respect to compensation, hire, tenure, terms, conditions or privileges of employment if the individual is able to and competent to perform

the services required . . . ."  W. Va. Code § 16B-17-9(1)

(2024).  The Act further prohibits any type of reprisal against

a person who "has opposed any practices or acts forbidden under

this article or because he or she has filed a complaint,

testified or assisted in any proceeding under this article."  W.

Va. Code § 16B-17-9(7)(C) (2024).  In sum, the Act "imposes on

employers a duty to ensure, as best they can, that their

workplaces are free of sexual harassment that creates a hostile

or offensive working environment."  Conrad v. ARA Szabo, 480

S.E.2d 801, 809 (W. Va. 1996) (citing Hanlon v. Chambers, 464

S.E.2d 741 (W. Va. 1995)).

        The West Virginia Supreme Court of Appeals has held on

multiple occasions that cases under the West Virginia Human

Rights Act "are governed by the same analytical structures

developed under Title VII, at least where [our] statute's

language does not direct otherwise."  Barefoot v. Sundale

Nursing Home, 457 S.E.2d 152, 159 (W. Va. 1995) (citing W. Va.

Univ. v. Decker, 447 S.E.2d 259 (W. Va. 1994); Conaway v. E.

Associated Coal Corp., 358 S.E.2d 423 (W. Va. 1986)) (alteration

in original).  Because of this, West Virginia Human Rights Act

discrimination cases are subject to the same McDonnell Douglas

burden-shifting as Title VII cases.  See id. at 160; Balderson

v. Lincare Inc., 62 F.4th 156, 163 (4th Cir. 2023); Bryant v.

Gestamp W. Va., LLC, No. 2:22-cv-00262, 2023 WL 5493347 (S.D.W.

Va. Aug. 24, 2023) (Copenhaver, J.).  Under McDonnell Douglas
Corp. v. Greene, 411 U.S. 792 (1973), and its progeny, the
plaintiff must first present a prima facie case of employment
discrimination.  See Woods v. Jefferds Corp., 824 S.E.2d 539,
548 (W. Va. 2019).

Upon such a showing, the burden shifts to the
defendant "to prove a legitimate, nonpretextual, and
nonretaliatory reason for the" action.  Syl. Pt. 2, Powell v.
Wyo. Cablevision, Inc., 403 S.E.2d 717 (W. Va. 1991).  The
burden then shifts back to the plaintiff to rebut the legitimate
reasons, either through a "pretext analysis" where plaintiff
presents "evidence that the employer's proffered reason for the
discharge is merely a pretext for the discriminatory act," id.,
or a "mixed motives analysis" by showing that, although not
pretextual, "a discriminatory motive nonetheless played a
significant part in the employer's adverse decision," Mayflower
Vehicle Sys., Inc. v. Cheeks, 629 S.E.2d 762, 773 (W. Va. 2006).
This burden-shifting is designed to allow a plaintiff to use
circumstantial evidence despite direct evidence being
unavailable.  Skaggs v. Elk Run Coal Co., 479 S.E.2d 561, 581–82
(W. Va. 1996).

There are two types of sexual harassment under the
Act: quid pro quo harassment, where "an employer or its agent

64

conditions an employee's job, employment benefits, or continued
employment on his or her consent to participate in sex;" and
hostile environment harassment where "an employer
'discriminate[s] against . . . [a female employee] with respect
to . . . conditions or privileges of employment[,]' when the
workplace is infected, for example, by sexual barbs or
innuendos, offensive touching, or dirty tricks aimed at the
employee because of her gender."  Hanlon, 464 S.E.2d at 749
(quoting W. Va. Code § 5-11-9(1) (2002), now at § 16B-17-9(1)
(2024)) (alterations in original).  The latter is what is
alleged here.

        1.  Liability of Sims and the Commission

        West Virginia Human Rights Act claims can only be
brought against a plaintiff's employer.  See W. Va. Code § 16B-
17-9; Hanlon, 464 S.E.2d at 750; Conrad, 480 S.E.2d at 810.
Stephens, as Wood County Sheriff, was plaintiff's employer, and
thus plaintiff's West Virginia Human Rights Act claims are
appropriately brought against him.

        Plaintiff offers no explanation or argument as to why
her claims are actionable against Sims, but Sims also fails to

argue the point.[29]  Regardless, Sims cannot be liable to plaintiff for discrimination or retaliation under the West Virginia Human Rights Act, as he was not plaintiff's employer. Thus, plaintiff's Count II claims are dismissed as to Sims.

Remaining is the issue of whether the Commission can be held liable for the alleged hostile work environment under the West Virginia Human Rights Act.  As previously noted, West Virginia courts apply Title VII caselaw to the West Virginia Human Rights Act unless the Act directly contradicts such application.

The issue of whether more than one entity may be liable as an employer under the Act has been discussed only once by the West Virginia Supreme Court of Appeals, in Conrad v. ARA Szabo, 480 S.E.2d 801 (W. Va. 1996).[30]  In that case, the plaintiff was directly employed by a contractor but worked at a state jail facility.  Id. at 806.  Plaintiff alleged many incidents of hostility perpetrated by correctional officers and said she reported the behavior to her supervisor, who was employed by ARA Szabo, the same contractor that employed

---

[29] Sims' asserts only that his conduct was not sufficiently severe or pervasive to alter plaintiff's conditions of employment.  Sims & WCC Mem. Supp. 16–18.
[30] The Court's decision in Conrad was two decades prior to the Fourth Circuit's Butler decision.

plaintiff.  Id. at 807–08.  The court was amenable to the
plaintiff's assertion that multiple entities (in that case, the
regional jail authority, a political subdivision of the state,
and the contractor that directly employed plaintiff) could be
liable for discrimination under the Act and ultimately remanded
so as to afford plaintiff the opportunity to amend her
pleadings.  Id. at 815–16.  The court agreed that the principle
that multiple entities could be joint employers was in keeping
with the purposes of the Act.  Id.  However, because the court
in Conrad was reviewing the grant of motions to dismiss, it did
not give further guidance as to how to determine whether that
second entity was, in fact, a joint employer.

        In Burke v. Wetzel County Commission, 815 S.E.2d 520
(W. Va. 2018), the West Virginia Supreme Court of Appeals
considered whether a county employee who was a field appraisal
supervisor in the county assessor's office, was jointly employed
by the county assessor and the county commission for claims
under the Family Medical Leave Act, the West Virginia Human
Rights Act, and the West Virginia Whistle-Blower Law.  Id. at
520.  The Court noted its previous holding that county employees
hired pursuant to West Virginia Code section 7-7-7(a) – the
provision under which deputy sheriffs are hired – are joint
employees of the county commission and elected county officials.
Id. at 530 (citing Haney v. Cnty. Comm'n of Preston Cnty., 575

S.E.2d 434, 440 (W. Va. 2002)).  The Court emphasized the import of which provision the plaintiff was hired pursuant to, rather than the statute under which the plaintiff sought relief; "in the absence of a statute indicating otherwise," county employees hired pursuant to section 7-7-7 are considered jointly employed by the county commission and the elected official in whose office they serve.  Id. at 530.  Like Conrad, the Burke action reviewed a motion to dismiss and did not give further instruction as to the application of that joint employer rule to a hostile work environment claim under the West Virginia Human Rights Act.  Id.

The West Virginia Supreme Court of Appeals has also used the "joint employer" language in other contexts.  Notably, in Amoroso v. Marion County Commission, 305 S.E.2d 299 (W. Va. 1983), which the plaintiff cited in support of her argument that the Commission was her joint employer, the West Virginia Supreme Court of Appeal held that a county commission and county sheriff are joint employers of deputy sheriffs in the context of the West Virginia Wage and Hour Law.  Id. at 303.  Unlike the West Virginia Human Rights Act, the Wage and Hour Law defines "employer" to include "the State of West Virginia, its agencies, departments, and all its political subdivisions, any individual, partnership, association, public or private corporation, or any person or group of persons acting directly or indirectly in the

68

interest of any employer in relation to an employee;" and defines "employ" to mean "to hire or permit to work."  W. Va. Code § 21-5C-1(d)-(e).  In <u>Amoroso</u>, the definition of "employ" was critical, with the Court placing particular weight on the fact that the county commission could permit or not permit a person to work due to their statutory power to refuse to consent to a new hire.  <u>Amoroso</u>, 305 S.E.2d at 303.

The West Virginia Supreme Court of Appeals is thus amenable to the proposition that multiple entities may be considered employers under the West Virginia Human Rights Act, but has not provided guidance as to how that determination is to be made.  The court acknowledges that the Commission can be an employer under the Act; the question is whether it was plaintiff's employer.  Unlike the Wage Law in <u>Amoroso</u>, the West Virginia Human Rights Act defines "employer" as "the state, or any political subdivision thereof, and any person employing twelve or more persons within the state for twenty or more calendar weeks in the calendar year."  W. Va. Code § 16B-17-1(d).  The Act does not define "employee" except that it specifies that the term "shall not include any individual employed by his or her parents, spouse or child."  W. Va. Code. § 16B-17-1(e).

The language used by the West Virginia Supreme Court
to determine which entities qualify as an employer under other
acts, such as in Amoroso and Rowe v. Grapevine Corp., 456 S.E.2d
1, 3–4 (W. Va. 1995) (interpreting language of West Virginia
Wage Payment and Collection Act definition of "employ" to permit
joint employment), is not present in the West Virginia Human
Rights Act and was not analyzed by the Court in Burke as
respects joint employment under the Act.  Indeed, in Burke, one
of the cases cited for the proposition that the county
commission and county official jointly employ the official's
employee under section 7-7-7 is Amoroso, which makes that
determination after carefully interpreting the language of the
Wage and Hour Law.  Amoroso did not make that determination in a
vacuum, but rather viewed the employment relationship through
the lens of the act which the plaintiff was accusing the
employers of violating.  Sometime between Amoroso and Burke,
that determination morphed into the broader principle that
county employees hired pursuant to section 7-7-7 are jointly
employed by the county commission and the county official.

Regardless of its reasoning, the West Virginia Supreme
Court has declared that county employees hired under section 7-
7-7 are jointly employed by the county commission, and the Court
has applied this, at least at the motion to dismiss stage, to a
West Virginia Human Rights Act claim.  Thus, the court applies

this principle to the present action and finds that the Wood
County Commission is plaintiff's joint employer under the Act
and may be liable to plaintiff for any potential violations of
the Act.  The court notes, however, that joint employer status
does not mean that both employers are liable for the alleged
hostile work environment, which must still be imputable to the
employer — whether it be one, both, or neither.

      2.    <u>Disparate Treatment / Hostile Work Environment Claim</u>

      The West Virginia Supreme Court of Appeals uses a
four-part test to establish a sexual harassment claim "based on
hostile or abusive work environment."  Syl. Pt. 5, <u>Hanlon</u>, 464
S.E.2d 741.  The plaintiff must show:

> (1) the subject conduct was unwelcome; (2) it
> was based on the sex of the plaintiff; (3) it
> was sufficiently severe or pervasive to alter
> the plaintiff's conditions of employment and
> create an abusive work environment; and (4) it
> was imputable on some factual basis to the
> employer.

<u>Id.</u>  It should be noted that "[w]hen sexual harassment occurs,
the identity of the perpetrator is irrelevant to the victimized
employee.  A hostile environment can be just as oppressive when
it is created by co-workers, subordinates, or customers as when
it is caused by a superior."  <u>Id.</u>  at 750

      The court first considers whether plaintiff has
alleged a <u>prima facie</u> hostile work environment claim.

Plaintiff's allegations and testimony easily meet the first two elements of a hostile work environment claim.  Plaintiff says she was called a "whore" around the department by at least Cross and Windland after the settlement.  This is indisputably unwelcome conduct that is based on plaintiff's gender.

The question, then, is whether the unwelcome and gender-based conduct was sufficiently severe or pervasive to alter conditions of employment or create an abusive work environment, and imputable to plaintiff's employer.

The West Virginia Supreme Court of Appeals has emphasized the "high bar" that a plaintiff must clear "in order to satisfy the severe or pervasive test":

> Workplaces are not always harmonious locales, and even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard.  Some rolling with the punches is a fact of workplace life.  Thus, complaints premised on nothing more than "rude behavior by [coworkers],' Baqir v. Principi, 434 F.3d 733, 747 (4th Cir. 2006), "callous behavior by [one's] supervisors," Bass v. E.I. DuPont de Nemours & Co., 324 F.3d 761, 765 (4th Cir. 2003), or "a routine difference of opinion and personality conflict with [one's] supervisor," Hawkins v. PepsiCo, Inc., 203 F.3d 274, 276 (4th Cir. 2000), are not actionable under Title VII.

EEOC v. Sunbelt Rentals, 521 F.3d 306, 315–16 (4th Cir. 2008); see also Erps v. W. Va. Hum. Rts. Comm'n, 680 S.E.2d 371, 379 (W. Va. 2009) ("For a hostile work environment claim to be

actionable, the offensive environment must be sufficiently severe or pervasive so as to alter the conditions of the victim's employment and create an abusive working environment." (quoting _Garcez v. Freightliner Corp._, 72 P.3d 78 (Or. App. 2003))).  "Beyond petty grievances, plaintiff must demonstrate that the environment 'was pervaded with discriminatory conduct aimed to humiliate, ridicule, or intimidate, thereby creating an abusive atmosphere.'"  _Norris v. Simos Insourcing Sols., LLC_, No. 5:20-cv-189, 2021 WL 7541423, at *7 (N.D.W. Va. Nv. 23, 2021) (quoting _Sunbelt Rentals_, 521 F.3d at 316).  "[I]solated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."  _Faragher v. City of Boca Raton_, 524 U.S. 775, 788 (1998); _see also_ _Meritor Sav. Bank, FSB v. Vinson_, 477 U.S. 57, 67 (1986) ("[N]ot all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment . . . .").

"'Whether sexual harassment at the workplace is sufficiently severe and persistent to affect seriously the psychological well being of employees is a question to be determined with regard to the totality of the circumstances.'"  _Conrad_, 480 S.E.2d at at 812 (quoting _Henson v. City of Dundee_, 682 F.2d 897, 904 (11th Cir. 1982)).  Additionally, the test is an objective one.  _Bonds v. Leavitt_, 629 F.3d 369, 385 (4th Cir.

2011) ("Establishing the third element requires that the plaintiff show that the work environment was not only subjectively hostile, but also objectively so." (citing <u>Sunbelt Rentals</u>, 521 F.3d at 315)).

"In a case where an employee is sexually harassed by a coworker, the employer may be liable only 'if it knew or should have known about the harassment and failed to take effective action to stop it.'" <u>Norris</u>, 2021 WL 7541423 (quoting <u>Howard v. Winter</u>, 446 F.3d 559, 565 (4th Cir. 2006)). "An employer's liability in a case where the source of the sexual harassment does not include management personnel depends on its knowledge of the offending conduct, the effectiveness of its remedial procedures, and the adequacy of its response." Syl. Pt. 4, in part, <u>Conrad</u>, 480 S.E.2d 801. "Knowledge of work place misconduct may be imputed to an employer by circumstantial evidence if the conduct is shown to be sufficiently pervasive or repetitive so that a reasonable employer, intent on complying with the West Virginia Human Rights Act, would be aware of the conduct." Syl. Pt. 5, <u>id.</u>

Chief Deputy Sims and the Commission assert that plaintiff's evidence is "of a series of relatively isolated events over an 18-month period," that the severity of some events is directly contradicted by the deposition testimony

74

(such as whether Sims insinuated plaintiff was fat), and that the alleged conduct did not alter the terms or conditions of plaintiff's employment.  See Sims & WCC Mem. Supp. 16–18.  As for any decline plaintiff may have suffered in her work experience, Sims and the Commission point to other stressors in plaintiff's life that may have contributed.  Id. at 18. Stephens similarly argues that the allegations are insufficient to constitute severe or pervasive adverse action.  See Stephens Mem. Supp. 6.

Plaintiff counters that she was called a "whore" on multiple occasions by multiple people in the department after the 2020 Settlement, frequently enough that knowledge of the same was widespread,[31] and that Stephens was responsible for "fostering an environment where such conduct was accepted and repeated."  Pl.'s Resp. to Stephens 16–17.  The hostile environment is evidenced, plaintiff says, by her contention that she was "forc[ed] to use her paid time off and unpaid time off as an avoidance mechanism to escape the shame and humiliation caused by the harassment."  Id. at 17.

---

[31] The deposition testimony is not dispositive as to whether there were other instances of plaintiff being called a "whore" after the 2020 Settlement, by Stephens or others, beside the known instances during the disparaging comments incident in July 2021.  Stephens was not asked whether he called plaintiff a "whore" after the 2020 Settlement.

The court will not consider the "pregnant clothing incident," the childcare comments, or the reprimand for missing a court appearance for the following reasons and those already noted. The "pregnant clothing" incident and the reprimand from Sims about missing an abuse and neglect hearing were, based on the record, appropriate action for a supervisor to take. Sims and Stephens testify that they never called plaintiff fat, and plaintiff herself testifies that she was not directly called "fat," but took the comments that way. Meanwhile, Stephens and Sims had an interest in ensuring that workplace decorum was upheld, which includes appropriate dress. It is well within a supervisor's purview to ask an employee to wear office-appropriate clothing, and there is no evidence that plaintiff was singled-out or that Stephens and Sims would not or did not make similar comments to other employees.

Likewise, the email from Sims about plaintiff missing an abuse and neglect court hearing was, by all accounts, appropriate for the situation and something that Sims would have gone about in the same way for any deputy who missed a hearing. The email Sims sent does not appear to be overly harsh, and plaintiff acknowledges that she was responsible for being at the hearing. Her argument that she missed the hearing to be at therapy, and that the therapy was necessary because of the hostile environment that Sims helped create, does not alleviate

her of her responsibility to perform her standard work tasks.
Indeed, plaintiff's email response to Sims is more aggressive
than Sims' initial message.  While plaintiff undoubtedly did not
enjoy being reprimanded for failing to attend a hearing or
dressing inappropriately for work, and while she may have felt
she was being "piled on" by Stephens and Sims, there is no
evidence that defendants proceeded any differently in these
instances than they would have with any other deputy.

     The childcare comments were a singular instance of
outdated workplace comments made by a coworker who is not a
party to this case and is not otherwise implicated in any of the
events at issue.  While plaintiff contends that Stephens created
an atmosphere where others felt emboldened to make demeaning and
derogatory comments to her, a comment about childcare not being
an appropriate reason to change the shift schedule is rather
innocuous and is part of the normal trials and tribulations of
the workplace.

     Remaining are the Cross GPS incident and subsequent
disparaging comments incident.[32]  The court considers whether

---

[32] The court will consider the allegations that deputies failed
to provide a status check or backup to plaintiff, and the <u>Giglio</u>
list incident, when considering plaintiff's retaliation claim,
as these incidents are alleged acts of retaliation, not sexual
discrimination.

these allegations constitute conduct so severe or pervasive as
to alter plaintiff's conditions of employment or create an
abusive work environment.

Being called a "whore" by multiple people — at least
Windland and Cross during the disparaging comments incident — is
not only inappropriate but odious.  Plaintiff has sufficiently
alleged that she suffered as a result of this behavior, and it
is possible that a trier of fact could find an ordinary person
in plaintiff's situation would react in the same way.

Stephens' email regarding inappropriate behavior and
the internal investigation by the Sheriff's Office as to the
allegations admittedly stopped the name-calling.  The comments
began sometimes in early July 2021 (based on the testimony that
they swiftly followed the Cross GPS conversation, which occurred
in late June or early July), and Stephens' email was sent July
22, 2021.

Nevertheless, several instances of being called a
"whore" by multiple members of the department, including two
(Cross and Windland) who were plaintiff's superior officers and
thus, at times, her direct supervisors, is sufficient to
establish a prima facie case of workplace harassment.
Defendants' argument that the language was not sufficiently
severe or pervasive is unconvincing.  Courts have found that

even a very few incidents of name-calling, if sufficiently
severe, can meet the severe and pervasive element.  <u>Boyer-
Liberto v. Fontainebleau Corp.</u>, 786 F.3d 264, 281-81 (4th Cir.
2015) (two instances of employee being called a racial epithet
were sufficiently severe so as to create a triable issue).  A
trier of fact could find that being called a "whore" by superior
officers is sufficiently severe and pervasive as to create a
hostile work environment for a reasonable person.

Plaintiff's testimony further establishes, insofar as
is required to show a <u>prima facie</u> case, that the conduct was
imputable to Stephens.  Plaintiff testified that Stephens was
the root of this behavior, saying that his misogynistic attitude
and comments were heard around the office and gave others the
encouragement to act similarly.  Additionally, the disparaging
comments were made subsequent to a conversation initiated by
Stephens with Cross, wherein Stephens asked or insinuated that
plaintiff was engaged in sexual behavior with Cross.  Sims
testified that he thought Stephens was making a joke, which, if
true, the court finds concerning; Stephens' behavior had already
instigated a settlement between plaintiff and the Commission on
the issue of sexual harassment and allegations that he had
called the plaintiff a "whore," yet he allegedly made a joke to
another officer about plaintiff's sexual activities, which led

to several disparaging comments around the office about plaintiff being a "whore."

Thus, the burden shifts to the defendants to present a legitimate, non-discriminatory reason for the above-described actions. If they can do so, the burden will shift back to plaintiff to show that those legitimate reasons were a pretext for discrimination. Stephens argues that as Sheriff he had a legitimate reason for knowing whether officers were involved with one another generally, particularly where an employee may be cheating on her partner, also an employee, with another employee. This argument is called into question by two things, namely, the fact that Stephens should have known to be more tactful and discrete when asking such a question about plaintiff, whom he had already been reprimanded for sexually harassing; and the fact that Sims testified that he thought Stephens was making a joke.

Finally, the court addresses the case of Norris v. Simos Insourcing Solutions, LLC, wherein the District Court for the Northern District of West Virginia found that the alleged conditions were not sufficiently severe and pervasive where rumors about the plaintiff's sexual behavior, circulated by coworkers, were halted by management after the plaintiff lodged a complaint. 2021 WL 7541423, at *7. The court wrote that

"[i]solated incidents such as this – perpetuated by coworkers – simply do not rise to the level of severe or pervasive, particularly where, as here, upon learning of the alleged rumors, [plaintiff's supervisor] convened a meeting to address the rumors." Id. It continued: "'[W]hen an employer's remedial response results in the cessation of the complained of conduct, liability must cease as well.' . . . [A] plaintiff's preference for additional or stronger punishment following a complaint does not necessarily make a defendant's actions unreasonable." Id. at *8 (citing Howard, 446 F.3d at 571).

   This case is distinguishable because the individuals who allegedly called plaintiff a "whore" were not co-workers, but superiors, and plaintiff alleges that the behavior stemmed from Stephens, her employer. Indeed, although plaintiff admits that the disparaging comments ceased after Stephens sent out the email, she alleges that the comments stemmed in the first place from Stephens, who had earlier been called to account for similar misconduct affecting the very same person, the plaintiff. An individual cannot escape liability for creating a hostile work environment by initiating that environment and then putting a halt to it before he is able to be held accountable. The court finds that plaintiff's allegations create a triable issue as to whether Stephens created a hostile work environment.

As to the Cross GPS and subsequent disparaging comments incidents, there remains a triable issue as to whether Stephens intentionally created an alleged hostile environment by joking to Cross about plaintiff's sexual activity (suggesting that she was having an affair with another member of the department) or whether he was legitimately concerned about whether there was an inter-office romance of which he should be aware.  If Stephens was acting genuinely, he may or may not be liable for the subsequent comments; if he was joking and intentionally making rude comments about plaintiff's sexual activity, then he may be liable for the hostile work environment that allegedly ensued.

The Commission, as plaintiff's joint employer, may be liable for any allegedly ensuing hostile work environment if that hostility can be imputed to it.  Plaintiff testified that County Administrator Seufer was not available when she attempted to contact him, and that County Commissioner Couch never returned her call.  Couch confirmed that he received plaintiff's message but never acted upon the situation.  If the Commission was aware of a hostile work environment occurring in the sheriff's office, particularly one with very similar allegations to those it settled a year prior, the Commission may be liable for continuing to suffer the hostile work environment despite being informed of it by plaintiff.

82

3.   <u>Retaliation</u>

Regardless of whether there existed an actionable hostile work environment claim, a plaintiff may still bring a retaliation claim under the Act under certain circumstances:

> "Protected activity" under the West Virginia Human Rights Act includes opposition to a practice that the plaintiff reasonably and in good faith believes violates the provisions of the Act.  This standard has both an objective and subjective element.  The employee's opposition must be reasonable in the sense that it must be based on a set of facts and a legal theory that are plausible.  Further, the view must be honestly held and be more than a cover for troublemaking.  Thus, even if there was no actionable sexual harassment, the plaintiff could still have been engaged in a protected activity if she complained about being sexually harassed.

Syl. Pt. 7, <u>Conrad</u>, 480 S.E.2d 801; Syl. Pt. 10, <u>Roth v. DeFeliceCare, Inc.</u>, 700 S.E.2d 183 (W. Va. 2010)

There are four elements to a prima facie retaliation case under the West Virginia Human Rights Act, as under Title VII: (1) plaintiff engaged in a protected activity, (2) plaintiff's employer was aware of the protected activity, (3) plaintiff's employer took adverse action against plaintiff, and (4) there existed a causal link between the protected activity and the adverse action.  See <u>Boyer-Liberto</u>, 786 F.3d at 281 (citing <u>EEOC v. Navy Fed. Credit Union</u>, 424 F.3d 397, 405–06

(4th Cir. 2005)); Syl. Pt. 10, Hanlon, 464 S.E.2d 741; Syl. Pt. 9, Roth, 700 S.E.2d 183.

It is indisputable that plaintiff's initial complaint, which led to the 2020 Settlement, was protected activity. Defendants were certainly aware of the protected activity resulting in the 2020 Settlement.  Further, the court accepts, particularly for purposes of the summary judgment motions under consideration, that plaintiff sincerely believed that the harassment of which she subsequently complained was actionable. As noted, "protected activity" extends to an employee opposing "employment actions [she] reasonably believes to be unlawful." Boyer-Liberto, 786 F.3d at 282 (citing Navy Fed., 424 F.3d at 406).  Subsequent to the 2020 Settlement, plaintiff complained to Stephens and Sims by way of Tim Allen and Della Matheny about the comments being made around the department that she was a "whore."  Inasmuch as Stephens and Sims recount receiving the complaint and subsequently sending the department-wide email instructing deputies not to speak inappropriately of others, as well as initiating an internal investigation, they were quite aware of the protected activity.

The question, then, is to the latter two elements: whether plaintiff suffered adverse action caused by her employer that was causally related to the protected activity.  For the

reasons stated above, the court will not consider the childcare comments, the reprimand for missing the abuse and neglect hearing, or the pregnant clothing incident.  Remaining are the Cross GPS, <u>Giglio</u> list,[33] and status check incidents.

　　　　The hostile work environment and retaliation provisions have different goals and thus different standards. <u>Laurent-Workman v. Wormuth</u>, 54 F.4th 201, 217 (4th Cir. 2022). The anti-retaliation provision is broader because it is intended to deter "employer retribution that chills employee opposition to discrimination," and thus "any action that well might have dissuaded a reasonable worker from making or supporting a charge of discrimination' satisfies the materially adverse standard under the anti-retaliation provision." <u>Id.</u> at 216 (internal quotation marks omitted).  In a Title VII setting, it is noted that "[p]laintiffs need to show material adversity precisely because acts of retaliation that do not alter the terms of employment can still frustrate Title VII's aims."  <u>Id.</u> (internal citations omitted).

　　　　Nonetheless, "severity" and "pervasiveness" remain "useful units of measurement to determine whether claimed harassment is actionable," as they can aid the court in

---

[33] Plaintiff's arguments are almost entirely focused on the <u>Giglio</u> incident.

"determining whether the circumstances would dissuade a reasonable employee from opposing discrimination.  Id. at 217 (citations omitted).  "Material adversity" is a guideline that "separate[s] significant from trivial harms."  Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).  As with hostile work environment claims, "[t]he antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm. . . . An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience."  Id. at 67–68.

Two "guardrails" help limit the scope of what potentially retaliatory action is adverse: First, "requiring an employee claiming retaliation to show that her employer's actions are 'materially adverse' . . . separates minor harms from those that threaten to chill employees from opposing unlawful discrimination."  Laurent-Workman, 54 F.4th at 213–14. Second, adverse action is assessed using an objective reasonableness standard "to avoid 'the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings.'"  Id. (quoting Burlington Northern, 548 U.S. at 68–69).

86

Then, there is the issue of causation.  "Causation can be shown in two ways: by 'show[ing] that the adverse act bears sufficient temporal proximity to the protected activity,' or by showing 'the existence of facts that suggest that the adverse action occurred because of the protected activity,' or a combination of the two."  Id. at 218–19 (quoting Smith, 12 F.4th at 417) (alteration in original).

"'[T]emporal proximity between an employer's knowledge of protected activity and an adverse employment action' may establish causation only if it is 'very close.'"  Id. at 219 (quoting Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001)).  "[A]bsent other facts, temporal proximity between an employer's knowledge of protected activity and an adverse employment action must be 'very close' to establish the causation prong."  Roberts v. Glenn Indus. Grp., Inc., 998 F.3d 111, 126 (4th Cir. 2021) (citing Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001)).  Often the passage of a few weeks is sufficiently proximate to infer causation, a few months weakens the inference, and six months or more is too temporally remote to infer causation.  See Jacobs v. N.C. Admin. Off. of the Cts., 780 F.3d 562, 575 (4th Cir. 2015) (a three-week gap is sufficiently proximate to be heavily indicative of causation); Laurent-Workman, 54 F.4th at 219 (although there is no bright-line rule for temporal proximity, a two-month gap weakens the

inference of causation); King v. Rumsfeld, 328 F.3d 145, 151 n. 5 (4th Cir. 2003) (a ten-week gap significantly weakens the inference of causation); Roberts, 998 F.3d at 126 (three-month gap does not create strong inference of retaliation); Pascual v. Lowe's Home Ctrs., Inc., 193 F. App'x 229, 233 (4th Cir. 2006) (three-to-four-month gap "too long to establish a causal connection by temporal proximity alone"); Dalton v. Omnicare, Inc., 138 F. Supp. 3d 709, 724 (N.D.W. Va. 2015) (a six-month gap between protected activity and termination too temporally remote to infer causation); Clark Cnty. Sch. Dist., 532 U.S. at 273 (twenty-month gap "suggests, by itself, no causality at all").

Plaintiff appears to have engaged in two protected activities during the relevant time period: the complaint leading up to and the subsequent 2020 Settlement; and the complaint, albeit indirect, to Stephens about the "whore" comments in July 2021.

As plaintiff does not explain what causation existed between her protected activity and her placement on the Giglio list, the court is left to consider whether the timing of the Giglio list incident supports a finding of temporal causation. Over a year elapsed between the June 2020 Settlement and the July 2021 Cross GPS list incident, which is far too long to

support a claim of causation based on temporal proximity alone. The court finds plaintiff cannot establish causation between the 2020 Settlement and Stephens' instigation of the Cross GPS incident.[34]

As to the <u>Giglio</u> list incident, the issue is not the causal link, but whether plaintiff's employer took retaliatory action against her. Plaintiff's allegations are insufficient as to this element. Despite her vehement protests that Stephens must have been involved in providing her hiring packet to <u>Lefebure</u>, the evidence is overwhelming that Cross acted alone and Stephens and Sims were not involved in providing that information in any way. Stephens, Sims, Lefebure, and Cross all testify that Cross did not notify Stephens or Sims of his concerns and acted alone in bringing the information to Lefebure.

Plaintiff's mere speculation that the chain of command makes it implausible that Cross acted alone cannot stand in the face of this testimony. Indeed, Cross had motive to bring the information to Lefebure that supports the testimony that he

_____

[34] The element of causation is further weakened by Stephens' email, sent within a month of the GPS incident that spurred the "whore" comments, and immediately after being confronted by Tim Allen about the comments. While it is possible that Stephens inspired the comments by instigating the Cross GPS conversation, once confronted, he did not long suffer them to continue.

acted alone.[35]  Cross, although a superior officer and thus
sometimes-supervisor of plaintiff, was never plaintiff's
employer, and plaintiff does not argue that he was.  For this
reason, and because plaintiff herself at the time of her hiring,
when she chose to provide the information that created the
problem leading to her placement on the Giglio list and later
did not advocate for herself when she had the opportunity in her
meeting with Lefebure, who informed her of his decision to place
her on the list, the Giglio list incident cannot be considered
as retaliatory action by any defendant in this case.

The same is true for the status check incident where
plaintiff alleges that she did not receive a status check when
she should have.  Stephens and Sims both testified that they
were unaware of the alleged incident; and plaintiff does not
provide any argument or explanation as to why Stephens and Sims
may have been responsible.  Thus, plaintiff's retaliation claim
fails.[36]

---

[35] The information was brought to Lefebure at the same time
Stephens' email was sent and Cross was subject to the internal
investigation regarding his derogatory language towards
plaintiff.

[36] The failure to provide backup incident, occurring after
Stephens and Sims had retired, and having gone through the
department's internal investigation process, was adequately
handled internally.

IV. CONCLUSION

For the reasons more fully set forth above, the court ORDERS that:

1.  Stephens' motion for summary judgment be, and it hereby is, GRANTED in part and DENIED in part, to the extent set forth below;

2.  Sims and the Commission's motion for summary judgment be, and it hereby is, GRANTED in part and DENIED in part, to the extent set forth below;

3.  Plaintiff's Count I claim be, and it hereby is, DISMISSED as the only remaining defendant to that count, the Wood County Commission, is an improper party;

4.  Plaintiff's Count II claims against Sims be, and they hereby are, DISMISSED as Sims is an improper party;

5.  Plaintiff's Count II retaliation claim be, and hereby is, DISMISSED as plaintiff has failed to allege a prima facie case of retaliation;

6.  Defendant Sims be, and he hereby is, DISMISSED from this action.

Remaining in this case is plaintiff's Count II claim against defendants Stephens and the Wood County Commission under the West Virginia Human Rights Act for sex discrimination by way of a hostile work environment.

The Clerk is directed to transmit copies of this order to all counsel of record and any unrepresented parties.

ENTER: March 20, 2024

John T. Copenhaver, Jr.
Senior United States District Judge